UNITED STATES of America, Appellee,

v.

Robert M. SENSI, Appellant.

No. 88–3100.

United States Court of Appeals, District of Columbia Circuit.

Argued May 4, 1989.

Decided July 11, 1989.

Daniel J. McGuan (appointed by this court), for appellant.

CeLillianne Green, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, and Theodore A. Shmanda, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before WALD, Chief Judge, and RUTH BADER GINSBURG and BUCKLEY, Circuit Judges.

Opinion for the court filed by Chief Judge WALD.

WALD, Chief Judge:

Appellant Robert M. Sensi challenges his criminal conviction in the United States District Court for the District of Columbia. Sensi, who was extradited to the United States from the United Kingdom prior to his trial, advances several arguments on appeal. First, he argues that he was indicted on charges other than those for which he was extradited, and that conse-quently his indictment was invalid under the terms of the United States–United Kingdom Extradition Treaty (the "Extradition Treaty" or the "Treaty") and should have have been dismissed by the district court. Second, Sensi contends that the district court erred in denying his motion for a judgment of acquittal. Third, he maintains that the district court erred in denying his motion for a new trial because the unavailability of certain witnesses and evidence impaired his constitutional rights of due process, compulsory process, and confrontation. Fourth, he argues that the prosecutor made a statement during his summation that confused the jury as to the burden of proof. Fifth, he asserts that the district court erred in denying his motion for a new trial based on newly-discovered evidence.

Finding each of these contentions to be without merit, we affirm the judgment of the district court.

## I. BACKGROUND

On August 14, 1986, officials of the Kuwait Airways Corporation contacted the Washington field office of the Federal Bureau of Investigation to report that an internal audit had turned up evidence of an embezzlement of funds from its Washington, D.C., sales office. Company officials indicated that appellant Sensi, the Regional Sales Manager for the airline, was believed responsible for the defalcation. Later that day, FBI agents obtained a federal arrest warrant charging Sensi with interstate transportation of stolen property.

On August 22, Sensi was arrested in London, by British police officials acting pursuant to that warrant. On September 18, 1986, a federal grand jury sitting in Washington, D.C., returned a 26–count indictment against Sensi. The indictment charged him with six counts of mail fraud, five counts of possession or receipt of stolen securities in excess of $5,000 in value transported in interstate and foreign commerce, four counts of first-degree theft under the District of Columbia Code, and eleven counts of transportation in interstate and foreign commerce of stolen secu-

rities and money in excess of $5,000 in value.

On September 26, 1986, the United States government presented the United Kingdom government with a request for the extradition of Sensi. Attached to the request were a certified copy of the indictment, copies of the relevant federal and District of Columbia criminal code sections, affidavits of witnesses, and a bench warrant for Sensi's arrest issued by a federal magistrate. On November 27, 1986, the United States government submitted more affidavits and documentary evidence to the United Kingdom government. On that day, after a hearing, a magistrate of the Bow Street Magistrates Court in London ruled that Sensi was extraditable, concluding that 18 charges of theft were made out by the evidence under United Kingdom law. Sensi was extradited to the United States on December 19, 1986.

Sensi was arraigned on December 22, 1986. He moved to dismiss the indictment; the district court denied the motion. *United States v. Sensi*, 664 F.Supp. 566 (D.D.C. 1987). Subsequently, trial commenced on March 10, 1988. The prosecution evidence set forth a scheme in which Sensi defrauded Kuwait Airways and stole from it more than $2.5 million over a five-year period. In essence, the evidence showed that Sensi, without authorization from Kuwait Airways, opened a bank account in the name of the airline (the "640 account"), deposited into it $2,597,945.55 worth of checks payable to the airline over the course of five years and, in the same span of time, wrote $2,568,918.02 worth of checks drawn on the 640 account, payable to "cash" and to numerous third parties. The trial resulted in a jury verdict of guilt on 21 counts and acquittal on five counts (the latter being the five charges of possession or receipt of stolen securities transported in interstate and foreign commerce). Sensi filed motions for judgment of acquittal, for new trial and for arrest of judgment, all of which the district court denied. Following the court's imposition of sentence, Sensi filed notice of this appeal.

## II. VALIDITY OF THE INDICTMENT

Sensi argues that the indictment cannot form the basis of a prosecution, because he was not extradited on the charges contained in the indictment. In effect, he reads the Extradition Treaty to forbid the prosecution of an extradited person for any violation of a United States criminal statute unless the scope of criminal liability for the charged offense is the same in both countries. This case calls on us to examine two related principles in extradition law: the rule that a person can be extradited only if his alleged offense constitutes a serious crime in both countries (the "double criminality principle"); and the rule that, once extradited, a person can be prosecuted only for those charges on which he was extradited (the "doctrine of specialty"). Sensi relies on the doctrine of specialty as a ground for reversal of his conviction,[1] but his discussion of that doctrine draws heavily on the double criminality principle. Consequently, we will explore the role of both principles as they relate to this case.

### A. The Double Criminality Principle

■ Article IX of the Extradition Treaty states as follows:

(1) Extradition shall be granted only if the evidence be found sufficient according to the law of the requested Party [in

---

1. In the district court, the United States argued that a criminal defendant has no standing to assert the principle of specialty, because only the requested state has the right to raise such an objection. The authority on this point is uncertain. *Compare Demjanjuk v. Petrovsky*, 776 F.2d 571, 583–84 (6th Cir.1985) ("there is a serious question whether [a defendant] has standing to assert the principle"), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986), *with United States v. Cuevas*, 847 F.2d 1417, 1426–27 n. 23 (9th Cir.1988) (defendant can raise doctrine-of-specialty claims "which might have been raised by the asylum state"), *cert. denied*, — U.S. —, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989). *See also* Restatement (Third) of Foreign Relations Law of the United States § 477, comment b ("While the case law in the United States and elsewhere is not consistent, it appears that the person extradited has standing to raise the issue...."). We need not resolve the question, as we conclude that Sensi's arguments are without merit.

the present case, the United Kingdom] ... to justify the committal for trial of the person sought if the *offense of which he is accused* had been committed in the territory of the requested Party....

Extradition Treaty, June 8, 1972, United States–United Kingdom, art. IX(1), 28 U.S. T. 227, 232, T.I.A.S. No. 8468 (emphasis added). The Treaty thus expressly embraces the double criminality principle of extradition law, which requires that the offense charged be punishable as a serious crime in both countries. *See* Restatement (Third) of Foreign Relations Law of the United States § 476(c) (1987).

■ Sensi argues that the indictment is invalid because "the English magistrate did not find sufficient evidence to extradite for a single charge in the indictment." Brief for Appellant at 7. In other words, Sensi claims the United States could not try him for mail fraud or interstate transportation of stolen property unless the British magistrate found sufficient evidence to commit him for trial on those exact charges. Article IX of the Treaty required the magistrate to decide whether Sensi could have been committed for trial had he committed the "offense of which he is accused" in the United Kingdom; Sensi apparently reads the quoted phrase as referring to *the United States Code section violation* of which the defendant is accused—for example, mail fraud as defined by 18 U.S.C. § 1341.[2]

This interpretation yields a startling, and incorrect, conclusion. Under Sensi's reading of the Treaty, a person extradited from the United Kingdom upon a British magistrate's finding that he stole money by means of the United States mails could not be prosecuted on mail fraud charges, because under United States law it is possible to commit mail fraud without successfully stealing anything,[3] while in the United Kingdom the crime of theft requires that the defendant succeed in taking something from someone else. Brief for Appellant at

7. Due to this difference in the laws of the two countries, had Sensi committed the "offense of which he is accused"—mail fraud—in the United Kingdom, he would not *necessarily* have been committed for trial for theft under United Kingdom law. Thus, Sensi would have us conclude, mail fraud is *never* an extraditable offense. Brief for Appellant at 7.

Sensi's contentions misread the Extradition Treaty and misunderstand the double criminality principle. By interpreting the article IX phrase "the offense of which [the defendant] is accused" as referring to the code section violation of which the defendant is accused, Sensi's reading of the Treaty would defeat extradition any time the criminal laws of the two countries were not perfectly congruent—even though the defendant's conduct would amount to a serious crime in both countries. This would be an absurd result, given that the criminal laws of two countries are rarely an exact match.

There is, moreover, abundant evidence that no such meaning was intended by the parties to the Treaty. First, the most natural reading of "the offense of which [the defendant] is accused" in this context is that the "offense" Sensi was charged with was stealing from his employer. Use of the mails, or interstate transport, were merely the means by which he accomplished his acts, and although they have jurisdictional significance under United States law, Sensi's "offense" was stealing. Article IX of the Treaty required the British magistrate to decide whether, had Sensi performed the same acts in the United Kingdom, those acts would have been sufficient *under United Kingdom law*—or, in the words of article IX, "sufficient according to the law of the requested Party"—to justify his committal for trial. The magistrate answered that question in the affirmative. The fact that a hypothetical person could be convicted of mail fraud in the

---

2. At oral argument, Sensi's counsel insisted that Sensi could not be tried in the United States for mail fraud unless the British magistrate ruled that his acts constituted mail fraud under United States law.

3. *See United States v. Lemm,* 680 F.2d 1193 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983); *United States v. Reicin,* 497 F.2d 563 (7th Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974).

United States *absent a theft* is irrelevant to this case, in which the "offense" *was* theft.

■ Second, the Treaty should be understood against the background of extradition law generally. Customarily, the double criminality principle requires that the *"acts* charged" constitute a serious offense in both countries. Restatement (Third) of Foreign Relations Law of the United States § 476, comment d (emphasis added). The Restatement makes clear that the focus is on the acts of the defendant, not on the legal doctrines of the country requesting extradition.

> [T]he fact that a particular *act* is classified differently in the criminal law of the two states does not prevent extradition under the double criminality rule.

> . . . . .

> The fact that defenses may be available in the requested state that would not be available in the requesting state, *or that different requirements of proof are applicable in the two states,* does not defeat extradition under the double criminality principle.

*Id.* comment d (emphasis added). The Supreme Court, in *Collins v. Loisel,* 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956 (1922), made the same point, emphasizing that the central focus is on the defendant's acts.

> The law does not require that the name by which the crime is described in the two countries shall be the same; *nor that the scope of the liability shall be coextensive,* or, in other respects, the same in the two countries. It is enough if *the particular act charged* is criminal in both jurisdictions.

*Id.* at 312, 42 S.Ct. at 470–71 (emphasis added). Thus, in the present case, the question is whether Sensi's alleged acts would constitute a crime in the United Kingdom. The British magistrate found that his acts consisted of stealing money and that those acts would justify committal for trial under United Kingdom law had they been committed in the United Kingdom. The double criminality rule clearly was satisfied.

■ Our conclusion that extradition was proper is bolstered by the existence of a protocol of signature that was added to the Treaty at the time of signing; the protocol addresses precisely this type of case. It provides that the United States can obtain extradition of a person—

> when United States Federal jurisdiction is based upon interstate transport or transportation or the use of the mails or of interstate facilities, these aspects being jurisdictional only.

28 U.S.T. at 236. The present case falls squarely under the terms of the protocol. Sensi's alleged offense was stealing; the significance of his use of the mails and of interstate transportation and facilities is "jurisdictional only," in that it permits him to be prosecuted under federal law. If it were not sufficiently clear from the body of the Treaty that Sensi's arguments lack merit, the protocol of signature in itself would resolve the matter. Indeed, since Sensi's arguments would effectively bar United States prosecution of any extradited person on charges such as mail fraud and interstate transportation of stolen property, the protocol shows that the Treaty parties anticipated such an argument and specifically wrote it out of existence.

■ In view of the extradition scheme established by the Treaty, we reject Sensi's apparent contention that article IX of the Treaty required the British magistrate to find a perfect congruence between the United States law violations of which Sensi was accused and the corresponding British criminal doctrines. The district court stated the law correctly: "Although the charges of the indictment may not correspond exactly to English offenses, it is the *facts* or underlying conduct supporting the charges which must correlate." 664 F.Supp. at 570 (emphasis in original).

## B. *The Doctrine of Specialty*

■ In light of the foregoing discussion of the double criminality principle, the merits of Sensi's main contention—that the United States' prosecution of him violated the doctrine of specialty—snap into sharper focus. While the double criminality princi-

ple requires a correspondence between Sensi's alleged acts and the laws of the United Kingdom, the doctrine of specialty requires a correspondence between the charges contained in the indictment and the facts presented to the British magistrate. The doctrine of specialty is embodied in article XII of the Extradition Treaty, which provides as follows:

> (1) A person extradited shall not be detained or proceeded against in the territory of the requesting Party [in the present case, the United States] for any offense other than *an extraditable offense established by the facts in respect of which his extradition has been granted....*

28 U.S.T. at 233 (emphasis added).

Sensi argues that none of the 26 counts of the indictment were offenses on which his extradition was based, and that, consequently, the district court should have dismissed his indictment. He points out that the British magistrate who extradited him set out 18 counts of theft. In light of this, Sensi contends, the United States could not charge him with the various offenses contained in the indictment, because those offenses were not "listed before the magistrate." Brief for Appellant at 7–9. In addition, he argues that the charges of mail fraud and of theft in violation of the District of Columbia Code are not "among the offenses for which extradition may be granted." *Id.* at 7–8.

The plain terms of article XII of the Extradition Treaty set out the two requirements that must be met for each count of the indictment. First, the charge must be "an extraditable offense." Second, the charge must be "established by the facts in

respect of which [the defendant's] extradition has been granted." Our review of the indictment is to be guided by the standard applicable to a defendant's assertion of the doctrine of specialty: "whether the requested state has objected or would object to prosecution." Restatement (Third) of Foreign Relations Law of the United States § 477, comment b; *see also United States v. Jetter*, 722 F.2d 371, 373 (8th Cir.1983) (standard is whether the surrendering state would regard the prosecution as a breach of the extradition treaty).

■■■■■ The first prong of the test asks, in effect, whether the charge is listed in the schedule of extraditable offenses annexed to the Extradition Treaty.[4] The Treaty itself makes clear that the name by which the crime is described in the United States Code or District of Columbia Code is irrelevant; a crime is an extraditable offense if it is "an act or omission the facts of which disclose an offense within any of the descriptions listed in the Schedule annexed to this Treaty." Extradition Treaty, art. III(1). The schedule shows beyond doubt that each of the 26 counts of the indictment describes an extraditable offense.[5]

■■■■■ The second prong of the test, contrary to Sensi's apparent belief, does not limit the United States to trying the defendant only for crimes denominated exactly as the British magistrate denominated the defendant's crimes. Our discussion of the double criminality principle made clear that the names of the crimes, and the scope of criminal liability, need not be the same in both countries. What the doctrine of specialty requires is that the prosecution be "based on the same facts as those set forth in the request for extradi-

---

**4.** Some offenses not listed in the schedule are nonetheless extraditable. *See* Extradition Treaty, art. III. Since each of the offenses in the present case is described in the schedule, we need not consider this possibility.

**5.** The facts surrounding Counts 1–6, the mail fraud charges, disclose an offense described under the following two schedule listings: "13. Theft; larceny; embezzlement" and "17. Obtaining property, money or valuable securities by false pretense or other form of deception." 28 U.S.T. at 235. As for Counts 7, 9, 11, 13, and 15, the charges of possession or receipt of secu-

rities known to be stolen which are part of interstate or foreign commerce, extraditability is established by the following schedule listing: "16. Receiving or otherwise handling any goods, money, valuable securities or other property, knowing the same to have been stolen or unlawfully obtained." *Id.* Counts 8, 10, 12 and 14, theft under the District of Columbia Code, are covered by schedule listing 13. Counts 16–26, transportation in interstate or foreign commerce of securities known to be stolen, are covered by schedule listing 16.

tion." Restatement (Third) of Foreign Relations Law of the United States § 477, comment a. In the words of the Extradition Treaty, the charges against Sensi must have been "established by the facts in respect of which his extradition [was] granted." Treaty, art. XII, 28 U.S.T. at 233. Thus, the test focuses on the evidentiary material that was submitted to the magistrate.

Sensi nonetheless cites *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), for the proposition that a person cannot be tried for an offense other than the one for which he was extradited, even if the same evidence underlies both offenses. In *Rauscher*, the Court held that a defendant extradited from the United Kingdom on a charge of murder on the high seas could not be tried on a charge of infliction of cruel and unusual punishment—despite the fact that, as in this case, both charges arose from the same incident and were based on the same facts. *Id.* at 432, 7 S.Ct. at 247. The Court observed in *Rauscher* that "it does not follow at all that ... a magistrate would have delivered [the defendant] on a charge ... which was of a very unimportant character when compared with that of murder." *Id.* Sensi argues that his indictment violates the *Rauscher* principle. *Rauscher*, however, is readily distinguishable: it did not hold the indictment invalid simply because it charged a crime denominated differently from the crime charged before the British magistrate. Rather, *Rauscher* held that the indictment was invalid because it charged the defendant with a crime not enumerated in the Treaty. *Id.* at 410–11, 429–30, 7 S.Ct. at 235–36, 245–46. The Court reasoned that if it were to uphold the cruel and unusual punishment charge, "the Treaty could always be evaded by making a demand on account of the higher offense defined in the Treaty, and then only seeking a trial and conviction for the minor offense not found in the Treaty." *Id.* at

432, 7 S.Ct. at 247. In this case, the indictment charged Sensi with crimes equivalent to those defined in the treaty, not with less substantial offenses not included in the treaty itself. *See supra* note 5. Indeed, the protocol of signature makes clear that the parties to the treaty envisioned extradition based on precisely the types of crimes with which Sensi is charged. *See supra* pp. 894–895. Unlike *Rauscher*, the extradition request in this case, as granted by the United Kingdom, itself included the indictment in question; under these circumstances, it can in no way be said that the United Kingdom "would object to prosecution." Restatement (Third) of Foreign Relations Law of the United States § 477, comment b.

▮ Our final task is to determine whether the evidence submitted with the United States' request for extradition sufficiently established the facts underlying Sensi's prosecution. The United States' original transmittal of September 26, 1986, contained, in attachments H and M, sufficient evidence to conclude that Sensi had committed theft and receipt of stolen property. The second transmittal of November 27, 1986, contained, in attachments N, O and P, sufficient evidence to conclude that Sensi had committed mail fraud and transportation of stolen property.[6] We agree with the district court that the evidence is sufficient to support each count of the indictment, as follows:

| Indictment Count | Attachment Pages |
| --- | --- |
| 1 | N2, O1, P2 |
| 2 | N3, O1, P2 |
| 3 | N3, O1, P2–3 |
| 4 | N3, O1, P3 |
| 5 | N3, O2, P3 |
| 6 | N4, O2, P3 |
| 7 | H3, M3 |
| 8 | H3, M3 |
| 9 | H3, M3 |
| 10 | H3, M3 |
| 11 | H3, M3 |
| 12 | H3, M3 |
| 13 | H3, M3 |

6. Sensi argues that Counts 1–5 are fatally flawed, because the indictment alleges that certain checks were mailed on or about May 6, 1986, while the British magistrate found that Sensi stole the proceeds of those checks on or about May 5, 1986. Given the use of the phrase "on or about" in both the indictment and the magistrate's findings, Sensi's argument is without merit.

| Indictment Count | Attachment Pages |
|---|---|
| 14 | H3, M3 |
| 15 | H3, M3 |
| 16 | O2, P3 |
| 17 | O2, O4 |
| 18 | O2, P4 |
| 19 | O2 |
| 20 | O2–3, P4 |
| 21 | O2–3, P5 |
| 22 | O2, P4 |
| 23 | O2–3, P5 |
| 24 | O2–3, P5 |
| 25 | O2, P4 |
| 26 | O2–3, P5 |

Consequently, we find that the indictment did not violate the specialty principle embodied in article XII of the Extradition Treaty. The district court's denial of the motion to dismiss the indictment was proper.

### III. THE MOTION FOR JUDGMENT OF ACQUITTAL

Sensi argues that the district court erred in denying his motion for judgment of acquittal. At trial, the crux of his defense was to show that he opened the 640 account, deposited Kuwait Airways funds into it, and withdrew funds from it in the belief that his conduct was authorized, either expressly or implicitly, by the Kuwait Ambassador to the United States and by members of the Kuwait royal family. He says that his testimony and other evidence at trial created an issue as to his mental state, and that the government failed to meet its burden of proving guilt beyond a reasonable doubt.

■ Sensi did introduce some evidence in support of his defense. He testified that the Kuwait Ambassador ordered him to open the 640 account and that a Sheik Jaber Al Athby Al–Sabah (a member of the royal family and deputy chairman of Kuwait Airways) told him to continue using the account. Sensi also relies on certain inferences drawn from undisputed facts. First, he argues that the bank would not have opened the account in the name of Kuwait Airways without a formal corporate resolution unless an official of Kuwait or a member of Kuwait's royal family had authorized the bank to do so. Second, he produced evidence tending to show that

Kuwait Airways had reason to know of the existence and use of the 640 account and failed to investigate promptly; from this he infers that high officials ratified his use of the account.

Nonetheless, taking all of Sensi's evidence and arguments into account, the government's evidence was sufficient to meet its burden. *See Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979) (reviewing court to determine "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt"). The jury could reasonably have been persuaded beyond a reasonable doubt that Sensi's claims of authorization are fallacious and that the failure of Kuwait Airways officials to track down his embezzlement promptly was merely a sign of carelessness, not a tacit approval of his conduct.

There was a considerable volume of evidence showing a lack of authorization to open and use the 640 account. First, Sensi opened the 640 account without the required corporate resolution and without any documentation showing he was authorized to open a bank account. Second, company officials testified that, under company policy, a person in Sensi's position was not authorized to open such an account, and that they knew of no exceptions to the rule. Third, the jury could have drawn inferences against Sensi from the lack of any record of the oral authorizations Sensi claimed to have received from the Ambassador and from members of the royal family. Fourth, the evidence tended to show that Sensi was in poor financial condition before opening the 640 account, supplying him with a motive to embezzle. Fifth, the jury could have drawn an inference of guilt from the nature of the expenditures made. Checks drawn on the 640 account were made payable to numerous parties besides Sensi himself; among them were Sensi's brother and two people identified at trial as business associates of Sensi. Even assuming that many of the checks drawn on the 640 account were legitimate Kuwait Airways business expenditures, Sensi's use of the account to pay for personal as well as business expenses was itself evidence of

guilt. Sixth, Sensi kept records of the 640 account in his home and directed that cancelled checks be held at the bank and picked up by him personally; these secretive measures undermined his claims of authorization. Finally, when Sensi was apprehended in London, his responses to questions put to him by a London police detective acknowledged having defrauded Kuwait Airways of $2 million over a five-year period.[7]

The jury certainly could have concluded, reasonably, that Sensi's guilt had been proved beyond a reasonable doubt. The district court's denial of the motion for a judgment of acquittal was proper.

## IV. FIFTH AND SIXTH AMENDMENT ARGUMENTS

Sensi argues that the district court erred in denying his motion for a new trial because the unavailability of certain witnesses and evidence impaired his due process,[8] compulsory process,[9] and confrontation[10] rights under the Constitution. In particular, he contends that the Kuwait government (which owns Kuwait Airways) in effect selectively waived diplomatic immunity by making available some witnesses to testify at his trial, while not making available other witnesses who would have corroborated his claim of authorization.

### A. *Due Process*

■ Sensi does not argue as a general matter that the United States must ensure criminal defendants access to witnesses outside the jurisdiction of the United States, nor could he. *See United States v. Zabaneh*, 837 F.2d 1249, 1259–60 (5th Cir. 1988) (defendant's inability to subpoena

foreign witnesses does not bar prosecution). Rather, he confines his argument to the circumstances of this case—a criminal case in which the complaining witness is a corporation wholly owned by a foreign government that is in a position to produce witnesses but refuses to do so. In support of his argument, he cites *National City Bank of New York v. Republic of China*, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955), in which the government of the Republic of China availed itself of the United States courts by suing a bank in federal court but then claimed sovereign immunity as a defense to the bank's counterclaims. The Supreme Court refused to let the Republic of China use the federal courts as both a sword and a shield; it held that the bank could proceed on its counterclaims. *Id.* at 363, 75 S.Ct. at 428. Justice Frankfurter wrote:

> We have a foreign government invoking our law but resisting a claim against it which would curtail its recovery. It wants our law, like any other litigant, but it wants our law free from the claims of justice.

*Id.* at 361–62, 75 S.Ct. at 427. Sensi argues that the Kuwait government is doing the same in this case, and that under the due process clause of the fifth amendment, the United States' prosecution of him should therefore be barred unless he can obtain the presence of exculpatory witnesses at a new trial.

We decline to extend the logic of *Republic of China* to a criminal prosecution brought by the United States government. The government of Kuwait is not a party to this case, but is only a complaining witness in a criminal case. The logic of *Republic*

---

7. When the police detective told Sensi he was charged in the United States with "defrauding or appropriating two and a half million U.S. dollars to the detriment of your employers, Kuwait Airways," Sensi responded: "It is two million dollars, actually." Transcript of March 15, 1988, 10:15 a.m. proceeding, at 12. Later, when the detective asked him how long he had been "defrauding or appropriating money from the company," Sensi responded: "Over a period of about five years, I guess. Maybe a little more. I can't give you exact dates." *Id.* at 22.

8. U.S. Const., amend. V ("No person shall be ... deprived of life, liberty, or property, without due process of law....").

9. U.S. Const., amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor....").

10. U.S. Const., amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him....").

*of China* might control if Kuwait Airways were to bring a civil action against Sensi in the United States courts and refuse to participate in discovery, but the United States surely has a right to vindicate the public interest in a criminal prosecution regardless of the Kuwait government's interests. Sensi argues that any discovery rights he would have in a civil action surely must apply in a criminal case, but in this he is mistaken. First, his contention ignores the foundation of the *Republic of China* rule, which focuses on the *quid pro quo* required of a party to litigation. Second, his insistence that a criminal defendant "is entitled to at least as much protection as a civil litigant," Brief for Appellant at 30, ignores the fact that criminal defendants' discovery rights are in many ways more limited than those of civil litigants. We find *Republic of China* to be inapposite.

### B. *Compulsory Process*

■■■ As we have declined to apply a special *Republic of China*-derived exception to Sensi, his sixth amendment compulsory process claim is subject to what Sensi concedes is the normal rule in criminal cases involving exculpatory witnesses outside the territorial power of the United States courts. It is well settled that a defendant's inability to subpoena foreign witnesses is not a bar to criminal prosecution. *See Zabaneh*, 837 F.2d at 1259–60; *United States v. Greco*, 298 F.2d 247, 251 (2d Cir.), *cert. denied*, 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962).

Moreover, it appears that Sensi did not use all the means at his disposal to obtain the needed testimony. For example, he could have sought court permission to depose witnesses residing overseas. *See* Fed. R.Crim.P. 15(a) (court may order taking of depositions "[w]henever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial"); 18 U.S.C. §§ 3503, 3507 (court can appoint special master to preside at foreign depositions). *See also United States v. Sun Myung Moon*, 93 F.R.D. 558 (S.D.N.Y.1982) (granting defendant's motion to take depositions

of witnesses residing in Japan). Alternatively, he could have asked the district court to issue letters rogatory addressed to a court of Kuwait seeking its assistance in gathering evidence from witnesses residing there. *See* 28 U.S.C. § 1781(b)(2); *United States v. Walus*, 616 F.2d 283, 304 (7th Cir.1980) (district court should have granted request of civil defendant, whose citizenship the government sought to revoke, for letters rogatory directed to the Polish War Crimes Commission). The fact that Sensi did not exhaust these alternatives only serves to undermine further his contention that the interests of justice compel a new trial.

### C. *Confrontation*

■■■ Sensi's confrontation clause argument must fail as well. He notes that, had the complaining party in this case been a natural person who took the stand to testify against him and then refused to be cross-examined, Sensi's right of confrontation would require that the witness' testimony be stricken. Sensi argues that this case is the functional equivalent of that hypothetical one: here, the complainant is a corporation, some of the officers of which testified against him while others refused to make themselves available to him. Sensi does not deny that his lawyer had ample opportunity to cross-examine every prosecution witness. His request that we treat a corporation as a single witness for cross-examination purposes is merely an effort to cast in different terms the same compulsory process claim we have found to be without merit. We likewise find his confrontation clause arguments without merit.

### V. PROSECUTORIAL MISCONDUCT

■■■ Sensi argues that the prosecutor's closing argument "almost certainly confused the jurors" and led them to effectively shift to Sensi the burden of proving his own innocence. Brief for Appellant at 34. He complains specifically of two incidents. In the first incident, the prosecutor stated as follows:

Mr. Sensi would still have you believe that, again, on the basis of this side deal, these oral statements to him *by witnesses that you never saw in this trial, that he never produced in this trial to back up,* that somehow this was all legitimate.

Transcript of March 18, 1988, 9:45 a.m. proceeding, at 11 (emphasis added). Sensi argues that the prosecutor thereby placed on him the burden of proving that he was authorized to conduct transactions using the 640 account. In the second incident, the prosecutor referred to an American Express bill that Sensi paid with a $24,-814.20 check drawn on the 640 account:

Now, members of the jury, *I defy you,* as you go through the actual charge slips that accompanied the bill that came out of Mr. Sensi's house—*maybe you can see the connection* as to the charges here which made up that very, very large amount *in anything that Mr. Saltzburg* [*the defense counsel*] *has maintained in his closing argument to you* about how these charges were in any way connected or related to Kuwait Airways or to anyone but Mr. Sensi and his friends and his former wife.

*Id.* at 82–83 (emphasis added). Sensi argues that these remarks effectively told the jury to place on Sensi the burden of explaining the checks he wrote.

Noting at the outset that Sensi's failure to object to these remarks at trial requires us to apply the plain error standard, we find Sensi's arguments to be without merit. He acknowledges that the jury was properly instructed that the government bore the burden of proof generally. His contention is that the jury "might well have been persuaded that the defendant had the burden of persuasion on an element of the

offense as a result of the prosecutor's argument." Brief for Appellant at 34 n. 16. We find nothing in the quoted remarks that would be likely to lead to such confusion. The first remark in effect stated that Sensi had countered the government's evidence of lack of authorization with nothing more than his own uncorroborated testimony. To point out that the jury can believe the defendant only if it takes him at his word can hardly be said to shift the burden of proof. The second remark in effect urged the jury to attach no credence to Sensi's claim that the checks drawn on the 640 account were spent on legitimate business expenditures. Both were attempts to persuade the jury that Sensi's claims were overwhelmed by the government's evidence of guilt; nothing in them would confuse the jury as to which party bore the burden of proof on the elements of each crime.[11] We reject Sensi's claim of prosecutorial misconduct.

## VI. NEWLY-DISCOVERED EVIDENCE

 After his conviction, Sensi moved for a new trial based on newly-discovered evidence, in the form of an affidavit of a former Kuwait Airways official, Inder Sethi. Sethi, who served as regional sales manager for the airline in New York from 1981 to 1986, was prepared to testify that Sensi had told him of the existence of a special bank account in Washington that was used to reimburse Sensi for outlays and to pay him for his services. Sethi was also prepared to testify that he believes Sensi honestly believed that his actions were authorized. Sensi argues that the district court erred in denying his motion for a new trial.[12]

---

11. Sensi contends that, "[a]s a result of the arguments made, the jury sought additional instructions from the Court." Brief for Appellant at 35. The jury did not, however, request reinstruction on the burden of proof; it sought reinstruction on the elements of mail fraud and the defense of authorization. Transcript of March 21, 1988, 9:40 a.m. proceeding, at 2.

12. Sensi also argues that the district court erred in failing to convene an evidentiary hearing regarding the substance and depth of Sethi's knowledge, "over and above the facts contained

in his affidavit." Brief for Appellant at 38. It is settled law, however, that the district court may decide a motion for new trial on the basis of affidavits without an evidentiary hearing. *United States v. Kearney,* 682 F.2d 214, 219 (D.C.Cir. 1982); *United States v. Ward,* 544 F.2d 975, 976 (8th Cir.1976). In this case, the district court interviewed Sethi in chambers and decided that he could add nothing to his affidavit. We see no error in the district court's handling of the motion.

Under the law of this circuit, a new trial based on newly-discovered evidence will be granted only when five conditions are met: (1) [T]he evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.

*United States v. Kelly,* 790 F.2d 130, 133 (D.C.Cir.1986) (quoting *United States v. Mangieri,* 694 F.2d 1270, 1285 (D.C.Cir. 1982)).

Assuming the first four factors to have been met in this case, Sensi fails to meet the fifth requirement. Although Sethi's testimony would have gone some distance toward corroborating Sensi's story, the fact remains that the great weight of evidence would still point to lack of authorization. In particular, Sensi's admissions to the British police detective, his secretive handling of the bank records, and the apparently personal uses to which he put the money all supply strong evidence of guilt. Sethi's testimony would not have been likely to produce acquittal. No new trial was called for.

### VII. CONCLUSION

We conclude that Sensi's indictment was valid under the United States–United Kingdom Extradition Treaty, and that the evidence was sufficient to persuade a reasonable jury beyond reasonable doubt that he was guilty. We reject his fifth and sixth amendment arguments concerning his difficulty in obtaining exculpatory witnesses from Kuwait. We reject his claim of prosecutorial misconduct, and, finally, we reject his argument that he was entitled to a new trial based on newly-discovered evidence. Appellant Sensi's conviction is therefore

*Affirmed.*