**UNITED STATES of America**

v.

**John MARTONAK, Defendant.**

**No. 91 CR. 768(MBM).**

United States District Court,
S.D. New York.

Feb. 6, 2002.

James B. Comey, United States Attorney for the Southern District of New York, Katherine Polk Failla, Assistant United States Attorney, New York City, for U.S.

Ian Weinstein, Fordham University School of Law, New York City, for Defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

The defendant, John Martonak, moves to bar further proceedings in this case, challenging the Court's jurisdiction to sentence him following his plea of guilty in October 1991 to a one-count information charging him with bank fraud in violation of 18 U.S.C. § 1344 (1994). The basis for his challenge, which accounts for the more-than-a-decade-long delay between plea and

sentence, arises from Martonak's fugitivity following his guilty plea, and his arrest in London and subsequent extradition to this country. Martonak argues that under the rule of specialty in extradition law—which holds that "the requisitioning state [here, the United States] may not, without permission of the asylum state [here, the United Kingdom], try or punish the fugitive for any crimes committed before the extradition except the crimes for which he was extradited," *Shapiro v. Ferrandina,* 478 F.2d 894, 905 (2d Cir.1973) (internal quotation marks omitted)—this court may not sentence him because the crime for which he was extradited is different from the crime to which he pleaded guilty and for which he is to be sentenced. Martonak does not dispute that the crime to which he pleaded guilty is extraditable under the relevant treaty between the United States and the United Kingdom.

The government argues both that (i) Martonak lacks standing to raise this issue, because the rule of specialty protects the interest of the asylum state—the United Kingdom—and not the interest of the defendant, and (ii) Martonak is wrong on the merits because under the terms of the relevant treaty, the crimes for which he was extradited and for which he is to be sentenced are the same, and thus there is no violation of the rule of specialty.

For the reasons set forth below, it appears that Martonak does have standing to argue the rule of specialty, but that the rule would not be offended if Martonak were sentenced for the crime to which he pleaded guilty. Therefore, Martonak's motion is denied.

## I.

As noted, Martonak pleaded guilty before me in this case in October 1999. The allocution included the following colloquy among the Court, the prosecutor (Nelson Boxer), the defendant, and defense counsel (Ian Weinstein):

THE COURT: Mr. Boxer, do you want to give me a summary of what the government's evidence would be if this case went to trial.

MR. BOXER: At trial, your Honor, the government would be able to prove that Mr. Martonak mailed a check as described in the information, $35,100 check, bearing a certification stamp drawn on a Dreyfus Liquid account, to Spink & Son Auction House for certain precious coins, and the government would also be able to prove that at the time Mr. Martonak sent that check, the account was closed, in addition to which the government would be able to prove that the certification on that check was a bogus certification.

THE COURT: Mr. Martonak, do you want to tell me in your own words what you did that makes you believe that you are guilty of the charge in this information?

THE DEFENDANT: I did draw the check as suggested and attempted to receive rare coins from this auction house, sent it as a payment.

THE COURT: And you obtained the bogus certification as well?

THE DEFENDANT: Yes, sir.

MR. WEINSTEIN: Just so the Court is clear, it was a certification that Mr. Martonak was able to produce basically by his own hand or with the aid of a home computer. It wasn't just stamped with any insignia from the bank.

THE COURT: Is that correct, Mr. Martonak?

THE DEFENDANT: Yes, sir.

THE COURT: And you sent it in?

THE DEFENDANT: Yes, I did.

THE COURT: Where did this happen?

THE DEFENDANT: I was living in New York and I sent it to the auction house in Australia, in Sydney.

THE COURT: Where in New York are you living?

THE DEFENDANT: I am at 350 East 30th Street, here in Manhattan.

THE COURT: And you are pleading guilty to this crime because you are in fact guilty?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Boxer, Mr. Weinstein, you agree there is sufficient factual predicate for the plea?

MR. BOXER: I would just ask your Honor if you would inquire as to whether the defendant knew that the account was closed at the time that he made the check.

THE COURT: Were you aware that the account was closed at the time you sent the check?

THE DEFENDANT: Yes, your Honor.

(10/9/91 Tr. at 10–12; 10/10/01 Letter of Katherine Polk Failla to the Court ("Failla Ltr."), Ex. A at 55–57)

Martonak's plea before me in 1991 was then the last of a series of three charging instruments to which Martonak had pleaded guilty in this Court. The first two charged him with mail fraud, under docket numbers 88 Cr. 898(MBM) and 90 Cr. 270(DNE). As the initials in the docket numbers suggest, the first of those cases was assigned to me, the second to the late Judge David N. Edelstein. The criminal conduct underlying Martonak's guilty pleas in the 1990 case and the instant case also constituted violations of the terms of his supervised release in the 1988 case before me, and Martonak pleaded guilty as well before me in October 1991 to the supervised release violations in the two earlier cases. (10/9/91 Tr. at 13–14)

Initially on March 6, 1992, and again on March 11, Martonak failed to appear for sentencing, and a bench warrant was issued.

In April and July 1999, Martonak was arrested in London, and when his whereabouts were made known to the United States Attorney's Office in this District, extradition proceedings were initiated under the extradition treaty between the United States and the United Kingdom. Article XII of that treaty provides in relevant part as follows:

> A person extradited shall not be detained or proceeded against in the territory of the requesting Party [here, the United States] for any offense other than an extraditable offense established by the facts in respect of which his extradition has been granted . . . .

Extradition Treaty, June 8, 1972, U.S–U.K., art. XII(1), 28 U.S.T. 227, 233. Those proceedings began in September 1999 with a formal diplomatic note from the American Ambassador to the Secretary of State for Foreign and Commonwealth Affairs, requesting Martonak's provisional arrest. (Failla Ltr. at 4–5) Following intermediate steps not here relevant, Martonak's extradition case was heard before Magistrate Geoffrey Breen in Bow Street Magistrates' Court, London. The prosecution's case consisted of a packet of papers submitted to the Magistrate, and included a list styled "Committal Charges" which purported to describe the charges on which Martonak's extradition was sought, an order establishing the Magistrate's authority to proceed, and a separate group of documents received from the United States—tied together with a ribbon and under seal of the Department of State—consisting in part of certified copies of various documents from this Court and including the information in this case and the transcript

of Martonak's plea allocution. (Failla Ltr. Ex. A, at 43, 45–63)

The first document in the packet submitted to the Magistrate—the list of "Committal Charges"—describes Martonak's convictions in the 1988 and 1990 cases, and the supervised release violations relating to them, and describes his conviction in the instant case as follows:

> John Martonak (aka John Weston) in or about June 1990 dishonestly attempted to obtain from Spink and Son Auction House coins, with intention of permanently depriving the said Spink and Son Auction House thereof by deception namely by falsely representing that a cheque for $35,100 drawn on the account of Dreyfus Liquid Assets was a good and valid order for payment and that the cheque certification was genuine.
>
> Sentence in respect of the above conviction is outstanding.

(Failla Ltr. Ex. A, at 1A) The extradition proceedings ended with a decision adverse to Martonak in the House of Lords in May 2001, and he was returned to this District in July.

Martonak's specialty rule claim is based on the above quoted portion of the "Committal Charges," which appears to describe his crime as an attempt to defraud the auction house to which the worthless check was sent, rather than an attempt to defraud the bank on which that check was drawn. Because Martonak pleaded guilty to bank fraud—directed perforce at the bank—rather than mail fraud—directed at the auction house—he argues that if he is sentenced it would be for a crime different from the one for which he was extradited, and the rule of specialty would be violated.

## II.

Before Martonak's claim can be addressed, the court must first address the question of whether Martonak has stand-ing to raise it. There appears to be divided authority on that point, *see United States v. Nosov*, 153 F.Supp.2d 477, 480 (S.D.N.Y.2001) (collecting cases), with some courts holding that only the asylum state may raise issues of specialty, inasmuch as the rationale for the rule of specialty rests on protecting the interest of that state in preserving the limits of its agreement to extradite a particular defendant, and others holding that the extradited defendant may raise whatever objections the asylum state might have had. *See id.*

■ Although the *Nosov* court did not appear to rule explicitly on the issue of standing, noting instead that "even if Nosov had standing, his argument would fail," *id.*, I do not believe I am free so to avoid the standing issue. In *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), the Supreme Court held that federal courts are not free to assume subject matter jurisdiction and decide the merits—exercising "hypothetical jurisdiction"—even if the jurisdictional issue is far more nettlesome than the merits and even if the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied. *Id.* at 94, 118 S.Ct. 1003. Rather, the issue of subject matter jurisdiction must be addressed, and, as noted in *Steel Co.*, "[s]tanding to sue is part of the common understanding of what it takes to make a justiciable case." *Id.* at 102, 118 S.Ct. 1003 (citation omitted).

■ The Court listed three requirements that make up the "irreducible constitutional minimum of standing." *Id.* at 102, 118 S.Ct. 1003 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (internal quotation marks omitted). "First and foremost" among them is "an 'injury in

fact'—a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent, not "conjectural" or "hypothetical." ' " *Id.* at 103, 118 S.Ct. 1003 (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). The other two are causation and redressability, *id.* at 103, 118 S.Ct. 1003, which are not at issue here. What is at issue is whether Martonak can claim that he would suffer an injury in fact from a prosecution that exceeded, or at least differed from, what the United Kingdom had agreed to extradite him for.

The government cites *Shapiro v. Ferrandina,* 478 F.2d 894 (2d Cir.1973), for the proposition that Martonak lacks standing, and the opinion in that case, by Chief Judge Friendly, does in fact say that "[a]s a matter of international law, the principle of specialty has been viewed as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right accruing to the accused." *Id.* at 906 (citations omitted). However, although the opinion says that, the Court in *Shapiro* did consider the specialty arguments the petitioner raised, even though the United States was the asylum state in that case and urged the Court not to consider those arguments, and even though, as Judge Friendly recognized, any ruling in such a case "can only be advisory in character, and in certain circumstances might cause embarrassments to the executive branch in the conduct of foreign affairs." *Id.*

■ The government also cites *United States v. Reed,* 639 F.2d 896 (2d Cir.1981), for the proposition that "absent protest or objection by the offended sovereign, [the defendant] has no standing to raise violation of international law as an issue." *Id.* at 902. *Reed,* however, involved a claim by a defendant that he had been abducted from a foreign country that had an extradition treaty with the United States, and did

not involve any principle of specialty. It had long been the law that how a defendant came into the control of the sovereign was irrelevant to whether he could be tried, *see Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952) (applying *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886)), absent blatantly lawless and overreaching conduct by the government, *see United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974). *Reed* simply applied that longstanding law.

■ In *United States v. Jurado–Rodriguez,* 907 F.Supp. 568 (E.D.N.Y.1995), Judge Weinstein permitted an extradited defendant to invoke the rule of specialty, "but only to the extent of the surrendering country's wishes." *Id.* at 576. That appears to be a reasonable rule of standing that has the virtue of following the standing rules of *Steel Co.* while at the same time assuring that the wishes of the asylum state will govern. Here, Martonak indisputably would suffer an injury of the most direct sort if he were to be sentenced to jail for a crime that the United Kingdom did not agree he should face upon extradition. Of course, whatever Martonak's argument, the position of the United Kingdom on the limits of its extradition order could always be presented to the Court through an appropriate representative, and would govern. On this basis, and absent any authoritative declaration from the United Kingdom that no rule of specialty issue exists, Martonak has standing to argue the issue of specialty.

### III.

■ Although Martonak has been allowed to raise the issue of specialty, he is wrong on the merits. For the reasons set forth below, sentencing him on the bank fraud charge to which he pleaded guilty is within the limits set by the asylum state, the United Kingdom.

As noted above, Article XII of the governing treaty between the United States and the United Kingdom, as applied here, bars the United States from punishing Martonak "for any offense other than an extraditable offense *established by the facts in respect of which his extradition has been granted* ...." Extradition Treaty, *supra*, 28 U.S.T. at 233 (emphasis added). As the highlighted language says, what governs is what has been "established by the facts in respect of which his extradition has been granted." *Id.* The "facts," insofar as they relate to the bank fraud charge in dispute, are contained in Martonak's guilty plea allocution, part of which is quoted at pages 2–3 above, and which was presented to Magistrate Breen in Bow Street Magistrates' Court. Those were the "facts in respect of which" Martonak's extradition was granted, and they establish bank fraud under the laws of the United States.

That the list of charges presented to the Magistrate, including the supervised release violations and the bank fraud charge, might have misdescribed the bank fraud charge so as to make it look like mail fraud, is irrelevant. That much is plain from the language of the treaty, which makes the extradition determination turn on the facts presented to the tribunal determining the issue, not on the nature of the offense for which extradition is sought.

The same argument Martonak relies on here was raised by the defendant in *United States v. Sensi*, 879 F.2d 888 (D.C.Cir. 1989), and rejected. There, Sensi, a defendant extradited from the United Kingdom, argued, among other things, that "the British magistrate who extradited him set out 18 counts of theft." *Id.* at 895. Sensi contended that "the United States could not charge him with the various offenses contained in the indictment, because those offenses were not 'listed before the magis-

trate.'" *Id.* (quoting the defendant's appellate brief). The Court rejected that claim, and held that all that is required under the doctrine of specialty, as applied to the same treaty at issue in this case, "is that the prosecution be 'based on the same facts as those set forth in the request for extradition.'" *Id.* at 895–96 (quoting Restatement (Third) of Foreign Relations Law of the United States § 477, cmt. a (1987)). "Thus, the test focuses on the evidentiary material that was submitted to the magistrate." *Id.* at 896.

The list of charges that appears on a page preceding the certified copies of documents received from the United States is not "evidentiary material that was submitted to the magistrate."

For the above reasons, Martonak's request to bar further proceedings in this case is denied, and the Court will proceed to sentence him at a date and time to be determined after consultation with counsel.

SO ORDERED.