**UNITED STATES of America, Plaintiff,**

v.

**Thanong SIRIPRECHAPONG, Defendant.**

**No. CR–91–0629 VRW(JL).**

United States District Court, N.D. California.

April 24, 1998.

Order Clarifying Report and Recommendation July 2, 1998.

John Lyons, Assistant United States Attorney, U.S. Attorney's Office, San Francisco, CA, for U.S.

Karen Snell, Clarence & Snell, San Francisco, CA, for Defendant.

## REPORT AND RECOMMENDATION

LARSON, United States Magistrate Judge.

### PROCEDURAL BACKGROUND: ORDER OF REFERENCE

Currently pending before the District Court (Hon. Vaughn R. Walker) are three motions filed by defendant Thanong Siriprechapong: (1) a motion to dismiss for grand jury misconduct, (2) a renewed motion to dismiss for lack of jurisdiction and (3) a motion to compel discovery related to the motions to dismiss. By its order filed February 4, 1998, the District Court referred the motion to compel discovery to this court for a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1), to be submitted no later than April 20, 1998. The Government and Siriprechapong may then submit memoranda to the District Court with regard to the report and recommendation. A hearing on the discovery motion is scheduled before the trial court on June 2, 1998. The District Court reserves judgment on Siriprechapong's two motions to dismiss until after the discovery issues are resolved.

### PROCEDURAL BACKGROUND: FURTHER BRIEFING AND HEARING

In conjunction with the trial court's assignment of the discovery issues related to the motions to dismiss, this court received and has reviewed Defendant's motion for discovery, the response of the Government, and the reply of the Defendants. The court also reviewed the moving and opposing papers and accompanying declarations in defendant's motions to dismiss for government misconduct and lack of jurisdiction.

The Defendant seeks a wide variety of materials and information related to agent Frank Gervacio, the informant Michael Woods, and the circumstances underlying the indictment and extradition of the defendant from Thailand. However, this court soon found that the separate requests were not supported by legal authority of any detailed showing of materiality in Defendant's motion to compel discovery, except in a general sense in the reply memorandum.

The Government in its opposition to Defendant's motion made numerous references to having already provided much of the requested information without specifying exactly what it had produced.

Accordingly, this court issued an order to both parties to file simultaneous final memoranda which addressed a number of issues: [1]

In its order this court stated that it had not previously found any authority which specifically relates to discovery ancillary to motions to dismiss for governmental misconduct or lack of jurisdiction. Accordingly, the court informed the parties that it would appreciate whatever specific direction counsel could provide or acknowledgment that the motion is based on general authorities, such as the supervisory power of the court or the Government's obligation to furnish all exculpatory information.

In addition, the court expressed concern about the breadth and length of the discovery requests and the potential intrusion into privileged areas, which would appear to require some kind of balancing of interests and perhaps *in camera* review of certain materials. It also appeared to this court that some requests might relate to matters of public record. And finally, it appeared that some of the information sought might be somewhat remote, irrelevant or unrelated to these motions. (Order at p. 4.)

The parties filed their briefs on April 6, 1998 and the court heard argument on April 10, 1998.[2]

## FACTUAL BACKGROUND

U.S. Customs Agent Frank Gervacio, the principal investigating law enforcement officer in this case, apparently met Michael Woods, who became an undercover informant in a related case, in the late 1980s, when Gervacio was also beginning to work undercover. Woods, a small-time drug dealer whose involvement in the facts of this case goes back to 1971, claimed ties to big-time smugglers. He had been arrested for possession of marijuana in 1976. By 1987, Woods was on the roster of drug informants for the Customs Service and the Drug Enforcement Administration in Reno. Woods and Gervacio worked together investigating the West Coast connection to marijuana smuggling from Thailand, and James Ells in particular.

The Government began building a case against Thanong Siriprechapong, a member of the Thai parliament and a prominent businessman and hotel owner who later came to be called "Thai Tony" by law enforcement officials. Woods continued to participate in various aspects of the investigation of Ells.

Siriprechapong was a philanthropist who donated money to repair schools, roads and hospitals. The Government alleges that he smuggled containership loads of marijuana, tons per shipment, from the Golden Triangle, where Burma, Laos and Thailand meet, from 1973 to 1982. The cargo allegedly was shipped to West Coast ports in California, Oregon and Washington, including San Diego, Long Beach and San Francisco.

Gervacio developed a close relationship with Woods, which included both work and pleasure. Woods even asked Gervacio to be best man at his wedding. In 1989, they were stopped by police at 1:00 a.m. while driving away from a bar and Gervacio was cited for driving a government car under the influence of alcohol. He told police that he was a customs agent on duty and that Woods was his confidential informant. His superiors did not discipline him, reassign him or otherwise remove him from his partnership with Woods. If anything, the two grew closer.

In 1991, Gervacio appeared as the sole witness before the grand jury in this case, which issued a three-count indictment, which led, in 1994–95, to the resignation of Siriprechapong from the Thai Parliament and initiation of the historic extradition of the first Thai citizen ever to be extradited to the United States by his country. The extradition was ultimately approved by a majority of the 83 appellate judges in Thailand after a

---

1. Order filed March 20, 1998, at pp. 2–3.

2. A transcript of the proceedings has been prepared and will be forwarded to the trial court along with the Report and Recommendation of the court.

long and torturous process which extended over two calendar years. Siriprechapong lost his appeals and was brought to the United States in 1996.

Gervacio told the grand jury that Siriprechapong and five co-conspirators began their smuggling operation in 1973. In his grand jury testimony, Gervacio named Woods as one of the individuals involved in the 1973 smuggling operation with Defendant. Prosecutors now concede that they cannot prove that Siriprechapong was involved in the operation that long ago. In addition, they state that they may not be able to prove the 1978 transaction. Gervacio also made statements which have been flatly contradicted by two other potential prosecution witnesses: James Ells, who pleaded guilty to money laundering, who says he never told Gervacio that Siriprechapong was his supplier, and Lars Groefsema, who pleaded guilty to drug and tax charges, who says that Siriprechapong never arranged for container ships to import marijuana.

Woods was paid substantial fees for his services as an informant. On one occasion in 1992, at Gervacio's request he kicked back a significant amount of cash and a valuable gift. Gervacio didn't report the matter to his superiors at the time. Gervacio admitted the "gratuity" to his superiors in September 1996; however, it was not revealed to the court until June 1997. Gervacio continued to press for additional payments to Woods long after Siriprechapong was indicted. Gervacio has been separately charged with the felony of accepting an illegal gratuity. Neither he nor Woods are expected to testify against Siriprechapong at trial.[3]

U.S. Customs Service Internal Affairs documents reveal that the U .S. Government knew about the drunk-driving incident in 1989. As for the cash gift in 1992, the U.S. Attorney claims that the Government did not know about it until years after the fact. In 1996, when the case against Siriprechapong was scheduled for trial before Judge Vaughn R. Walker, Gervacio apparently became concerned that his acceptance of cash from Woods would jeopardize the case. But no one informed Judge Walker for nine months.

Also in 1997, in papers filed in state court, Gervacio's wife, Cheryl, claimed that Gervacio abused alcohol and became violent with her. He also had financial troubles, despite his $85,000 annual salary, and he threatened to commit suicide in her presence. A letter from a psychologist to whom Gervacio was referred by Customs refers to his selective memory problems and financial difficulties.

Mr. Siriprechapong, through counsel, seeks to obtain documents which reveal information which would have discredited Gervacio during the grand jury proceedings and the extradition process and other materials which would tend to reveal material misrepresentations in both the grand jury proceedings and the extradition process. Siriprechapong contends that, had the American grand jury and the government of Thailand known the truth about certain events and the unreliability of Gervacio in general, he would have been neither indicted nor extradited.

## DEFENDANT'S MOTIONS TO DISMISS

### Motion to Dismiss for Government Misconduct Before the Grand Jury

Counsel for Siriprechapong contends, in this motion, that Gervacio made intentional or reckless material false statements to the grand jury, raising grave doubts whether the grand jury would have indicted on the charges for which Siriprechapong was extradited, if it had known the truth.

Defendant also asserts that the prosecutor in this case, Assistant U.S. Attorney John Lyons, knowingly acquiesced in Gervacio's misconduct and covered it up. Defendant bases this assertion, in part, on past conduct by the prosecutor in other cases, as well as on Lyons' concealment of wrongdoing by Gervacio from the court for several months.

On this theory, Defendant seeks discovery of otherwise unavailable material analogous

---

**3.** An interesting law review article expresses concern, *inter alia*, about "the Drug War's incentive structure [which] is unusual in that it threatens the due process of drug suspects and hinders effective law enforcement at the same time." Blumenson and Nilsen, "Policing for Profit: the Drug War's Hidden Economic Agenda," 65 U.Chi. L.R. 35 (1998).

to that involved in a motion to dismiss for discriminatory and vindictive prosecution. The specific requirements for obtaining discovery to prove a claim of selective prosecution, as delineated by the U.S. Supreme Court in the *Armstrong* case, are discussed in greater detail below. *U.S. v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).

The Government contends that any inaccurate statements were inadvertent, that no intentional misstatements were made, and that Gervacio's credibility is immaterial to the grand jury's decision to indict.

### Motion to Dismiss for Lack of Jurisdiction (Challenging Extradition)

Mr. Siriprechapong argues in this motion that the government of Thailand would not have extradited him if it had known that the case agent, Frank Gervacio, made material false statements both in the Affidavit of Investigator in Support of Extradition and in testimony which led to the indictment, which was also submitted to the government of Thailand, and that he had accepted money from an informant who was also involved in the investigation of Siriprechapong.

Defendant asserts that the U.S. Government possesses information that the government of Thailand was materially misled. He also requests any documents and communications between the United States and Thailand regarding the decision to extradite both before and after it was made.

The Government contends that there were no material misstatements, that the Thai authorities were not misled, and that any discrepancies between what was alleged in the documents in support of Defendant's extradition and what has emerged since is a mere variance of proof, permissible as long as the Defendant receives adequate notice of the charges alleged in general.

These motions call into question the integrity of the grand jury proceedings and the extradition process, two areas in which the court does not normally intrude except to examine claims of fraud, bad faith and perjury—pursuant to its supervisory power.

Following is a general analysis of the court's powers in discovery matters, a more specific application to the pending motion and, finally, recommendations regarding each defense request.

### LEGAL ANALYSIS: DISCOVERY IN A CRIMINAL CASE GENERALLY

Defense discovery is limited in a federal criminal case according to the Federal Rules of Criminal Procedure, Constitutional principles, and the supervisory power of the court. This court has found no case which directly authorizes discovery ancillary to a motion to dismiss for governmental misconduct or lack of jurisdiction under these circumstances.

Accordingly, any power of the court to grant discovery in relation to these motions to dismiss must be derived from these sources based on principles relied on in the cases and analogies drawn from similar circumstances. The applicable general rules, statutes, and certain representative cases are summarized below:

A useful general summary of the trial court's power to order and regulate discovery in a complex criminal case may be found in *U.S. v. McVeigh*, 954 F.Supp. 1441 (D.Colo. 1997), the Oklahoma Federal Building bombing case.

Fed.R.Crim.P. 16(a)(1)(C) provides that a defendant may inspect evidence material to the preparation of the defendant's defense or intended for use by the government as evidence in its case in chief at trial, or which was obtained from or belongs to the defendant.

Rule 16(a)(1)(E) precludes discovery, except as provided in paragraphs (A), (B), (D), and (E) of subdivision (a)(1), of reports, memoranda, or other internal government documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case. Nor does the rule authorize the discovery or inspection of statements made by government witnesses or prospective government witnesses except as provided in 18 U.S.C. § 3500 ("Jencks Act").

Defendant cites this section as partial authority for his discovery requests in this case.

However, at oral argument, defense counsel conceded, as she must under the reasoning of the Supreme Court in *Armstrong*, that where the discovery is not strictly speaking material to the preparation of the defense against the government's case-in-chief, a separate constitutional basis must be considered. *Armstrong*, 517 U.S. 456, 116 S.Ct. at 1482. *See also McVeigh*, 954 F.Supp. at p. 1447).

Fed.R.Crim.P. 6(e)(2) provides that grand jury proceedings are secret, with certain exceptions. Subsection (3)(C)(ii) permits disclosure to be made by the court, at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

The trial court has apparently ruled previously that the transcript of Gervacio's grand jury testimony should be disclosed to the defense, or the Government has voluntarily turned it over. In any event, it is already part of the record, and this court has read and considered it in connection with this Report and Recommendation.

A defendant, as part of his constitutional right to confront accusers, may seek evidence regarding credibility of witnesses. *Jencks v. U.S.*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). (Defense in federal criminal prosecution entitled, under certain circumstances, to obtain, for impeachment purposes, statements which had been made to government agents by government witnesses.) The definition of "statement" includes a written statement signed or otherwise approved or adopted by the witness, as well as a transcript of an oral statement, including the testimony of witness before grand jury. ·

This rule, of course, pertains to trial testimony, not grand jury testimony or material referred to in pre-trial motions. Since neither Gervacio nor Woods is slated to be a trial witness, this rule does not apply. However, it is important to keep in mind, as it does lend some symmetry to the arguably constricted system of criminal defense discovery.

Constitutional considerations mandate that the prosecution provide a defendant with all exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Supreme Court held that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

The *Brady* rule, however, is considered more in the nature of a constitutional protection, rather than a basis for granting or withholding discovery. No specific request to disclose *Brady* material is required, and the government is under a self-executing obligation to provide it. Again, the doctrine applies primarily to evidence which would be useful at trial, not to any pre-trial motion. In addition, the issue generally comes up in a post-trial context after a criminal defendant learns that exculpatory evidence in the possession of the government was not turned over. *U.S. v. Williams*, 792 F.Supp. 1120, 1129–30 (S.D.Ind.1992).

Nevertheless, the underpinnings of *Brady* and the following related cases have some currency in these proceedings, since the definition of "exculpatory" encompasses anything which tends to impeach the government's evidence. In the context of the motions to dismiss in the case at bar, Defendant contends that the requested information is exculpatory in the sense that it would tend to defeat the indictment and negate the extradition. For reasons to be developed below, this proposition is arguable but somewhat questionable in this context. But see concurring opinion of Justice Breyer, in *Armstrong*, 517 U.S. 456, 116 S.Ct. at 1490–91 (Constitutional mandate may override court-made rules [but argument not developed].).

The Court in *U.S. v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) defined materiality in discovery of *Brady* evidence. It held that the government may not withhold evidence from the defendant if there is a reasonable probability that had evidence been disclosed to the defense, the result of the proceeding would have been different. (Failure to disclose payment contracts to informants violates due process.) *Id.* at 683, 105 S.Ct. 3375.

In *Giglio v. U.S.*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) the Court permitted discovery of agreements regarding informants (where credibility of witness an important issue in case, evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and should be disclosed to defense and jury.)

This same reasoning also applies to payment arrangements. *U.S. v. Shaffer*, 789 F.2d 682, 689 (9th Cir.1986) (government may be required to disclose financial information regarding paid informant, as material to informant's credibility.) This could include: 1) status as paid informant in another criminal investigation; 2) full benefits and promises received in exchange for cooperation; 3) full extent of informant's assets; 4) status of informant's tax liability. Materiality depends on the trial judge's assessment of likely effect of the evidence on the outcome of the trial.

What is clear from *Brady* is that the government may not "suppress or secrete information known to them which does not fit into the narrative or the prosecutor's case, or which contradicts the evidence used to support that narrative, or which may diminish the credibility of the evidence relied on to tell the story. Stated simply, the prosecutors must not present proof of an historical narrative that they know not to be true. They must disclose to the defense the information known to or available to them which may develop doubt about the truth of the Government's narrative." *McVeigh*, 954 F.Supp. at 1449. Again, however, these principles so far appear to have been limited to the case at trial.

In *McVeigh*, the court also cited the latest Supreme Court opinion in this area, *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) in which the Supreme Court emphasized "the prosecutors' duty to become informed about available information and to evaluate the cumulative effect of all evidence withheld from the defendant." *Id.* at 421–22, 115 S.Ct. 1555. Thus, the *Brady*

line of cases can be read as establishing a fundamental rule of fairness which compels the government to disclose to the defense "the information known to them which may develop doubt about the truth of the Government's narrative." *McVeigh* at 1449.

As the court in *McVeigh* observed, "[T]here is no established procedure for the due process disclosures required by *Brady*. The information should be given to the defense as it becomes known to the Government, since the information and material must be available to the defense in sufficient time to make fair use of it. Generally, *Brady* violations first come before a court after the trial, and the court may then consider the materiality of what was suppressed or omitted from disclosures made, in the context of the complete trial record." 954 F.Supp. at 1449–50.[4]

A special application of discovery rules in a selective prosecution claim based on the equal protection clause of the Constitution was recently confirmed by the Supreme Court in *Armstrong*. The Court characterized the claim not as a defense on the merits but as an "independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." 517 U.S. 456, 116 S.Ct. at 1486. The Court pulled together the various phrases used by the lower courts in selective prosecution cases and the parties in that case, such as "colorable basis," "substantial threshold showing," "substantial and concrete basis," or "reasonable likelihood" in the following formulation: "Some evidence tending to show the existence of the essential elements of the defense," in the selective prosecution context—discriminatory effect and discriminatory intent. (Citation omitted.) *Id.*

A criminal defendant is also entitled to impeachment evidence regarding government agents. *U.S. v. Henthorn*, 931 F.2d 29 (9th Cir.1991), *cert. denied* 503 U.S. 972, 112 S.Ct. 1588, 118 L.Ed.2d 306 (1992) (government has duty to examine personnel files of testifying officers upon a defendant's request for their production, to determine if they

---

4. In *McVeigh*, the Court also noted that there have been special circumstances requiring a trial court to rule on a *Brady* question before trial.

However, the cited examples do not appear to be applicable in the instant case.

contain information that is or may be material to the defendant's case.) If the prosecution is uncertain about the materiality of information in its possession, it may submit the information to the trial court for an *in camera* inspection and evaluation. *Id.* at 30, citing *U.S. v. Cadet,* 727 F.2d 1453, 1467–68 (9th Cir.1984).

This court is informed that the trial court has already granted a motion under *Henthorn,* which apparently resulted in some disclosures material to these motions to dismiss. Again, this rule is primarily applicable to the trial context and adds little to the analysis of this motion except to establish the materiality of evidence of law enforcement misconduct in general.

A court also has a certain inherent authority to order and supervise discovery in a criminal case above and beyond any of the mentioned rules. *Williams, supra,* 792 F.Supp. 1120 (cited by both parties) (court has the "inherent power, exercisable under appropriate circumstances, to assure the proper and orderly administration of criminal justice.") Citation omitted. *Id.,* at 1123. Interestingly, however, the court in that case denied, for insufficient showing of materiality, transcripts of witnesses who testified only before the grand jury and would not be called at trial. *Id.* at 1131.

In an unrelated case, the Supreme Court has held that "[T]he court's supervisory power . . . may be used as a means of establishing standards of prosecutorial conduct before the courts themselves." *U.S. v. Williams,* 504 U.S. 36, 47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). However, the Supreme Court imposed limits on a trial or appellate court's power to establish rules for grand jury proceedings. Specifically, it held that a court could not impose a rule which created a duty for the grand jury to consider exculpatory evidence, since that would exceed the limitations of the power of federal courts to re-shape grand jury procedure. *Id.* at 47–52, 112 S.Ct. 1735. The Court distinguished the roles of grand and petit juries, and reiterated that the grand jury sits "not to determine guilt or innocence, but to assess whether there is an adequate basis for bringing a criminal charge." *Id.* at 51, 112 S.Ct. 1735.

■ A motion to dismiss an indictment for grand jury misconduct must rest on an overriding constitutional theory that the "structural protections of the grand jury have been so compromised as to render the proceeding fundamentally unfair, allowing the presumption of prejudice to the defendant." *Bank of Nova Scotia v. U.S.,* 487 U.S. 250, 259, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), or an "abrogation of constitutional rights sufficient to support dismissal of an indictment." *U.S. v. Isgro,* 974 F.2d 1091, 1096 (9th Cir.1992), *cert. denied,* 507 U.S. 985, 113 S.Ct. 1581, 123 L.Ed.2d 148 (1993).

## PENULTIMATE LEGAL ANALYSIS OF DISCOVERY ISSUES

The Defendant's principal theory is that Gervacio's credibility lies at the heart of both the grand jury indictment and the extradition proceeding. And "lies" is the operative term. Defendant claims to have chopped off at least both ends of the continuing criminal enterprise alleged in the indictment by exposing defects in the prosecutor's evidence. The Government now concedes it cannot establish the 1973 transaction and may or may not be able to establish Siriprechapong's participation in the 1978 shipment.

At the other end, the Defendant claims to have undermined Gervacio's statement that James Ells identified Siriprechapong as his source in 1987 during a recess in a subsequent debriefing. The Government in the April 10 hearing in this case stated that it may not present any evidence regarding Ells' alleged statement if he refuses, as expected, to testify at trial.

Elimination of both ends of the conspiracy, however, ineluctably leaves the middle—as many as six other shipments between 1983 and 1987—which the Defendant also challenges, claiming other defects in Gervacio's evidence, but not as significant as the above. The Government claims, even if its case is reduced to the middle period, the remainder constitutes an insignificant variance from the original charges.

This court notes at the outset of this analysis that the Defendant already has a tre-

mendous amount of evidentiary material,[5] certainly enough to go forward-with its potentially case-dispositive motions in the trial court.[6] Siriprechapong currently requests essentially any and all information which would tend to impeach Gervacio further, internal government documents and memoranda which would illuminate its deliberations and decisions in the charging and extradition processes, including correspondence with the government of Thailand, and other miscellaneous items.

While the requests are extremely detailed, the underlying case authority is not. The general principles which can be gleaned from the cited authorities are consistently met by broad policies insulating the government from extensive further discovery into the essentially closed processes of the grand jury and extradition. It would appear that the higher courts are of the view that most evidentiary contradictions are best resolved at trial. However, this general observation does not adequately deal with the issue of alleged misconduct by the government and its agent in the instant case.

The defendant's right to discovery ancillary to these motions appears to be governed most directly by the United States Supreme Court's analysis in *Armstrong, supra*. In that case, the Court reviewed the decision of the trial court granting discovery as to the defendant's claim of selective prosecution. The Court first considered the scope of Rule 16(a)(1)(C), rejecting its applicability, as counsel for Mr. Siriprechapong in the case at bar concedes she must as well. RT 16.

However, the analysis in *Armstrong* did not end there. The Court characterized a selective prosecution motion as "not a defense on the merits to the criminal charge itself, but an *independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution.*" (Emphasis added.) *Armstrong,* 517 U.S. 456, 116 S.Ct. at 1486.

In the case at bar, the Defendant's claim of governmental misconduct, with reference to both the grand jury proceedings and the extradition process, invokes the constitutional right to due process of law. Thus, the claims in *Armstrong* and this case are at least roughly analogous. As in *Armstrong,* the claim in this case constitutes an independent assertion that the prosecutor has brought the charges in this case under circumstances forbidden by the Constitution. The inquiry at the discovery stage, ancillary to the motion to dismiss, as in *Armstrong,* involves an attempt in part to penetrate the barriers of executive discretion guarded by presumptions of regularity to obtain material information reflecting on the strengths and weaknesses of the Government's "narrative," as the court in *McVeigh* put it.

The standard set in *Armstrong* is a demanding one. The Court reasoned, "These cases afford a 'background presumption,' [citation omitted] that the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Ibid.* Nevertheless, the Court held that discovery under this rubric is not prohibited, merely restricted. The defendant must present "clear evidence to the contrary" to the presumption that a prosecutor has not violated the Constitution (in that case, the equal protection clause). *Id.*

On the other hand, the comparison with *Armstrong* must not be carried too far. No issue of credibility of witnesses was presented in *Armstrong,* merely a failure of proof to establish clear evidence that the government had abused its discretionary power to prosecute the defendants in that case.

In *Armstrong,* the issue had nothing to do with the guilt or innocence of the defendants. Here it does, at least in part, since the defense straddles the issue of guilt-innocence by claiming he is entitled to dismissal for misconduct overriding any culpability of his and simultaneously that the evidence submitted to the grand jury and the Thai government was insufficient to establish probable cause.

Thus, this court must first address the question of whether potential additional challenges to Gervacio's credibility would suffi-

---

**5.** It is difficult for this court to determine exactly what has already been disclosed.

**6.** Counsel for the defense so stated at the April 10 hearing. RT 12.

ciently undermine confidence in the outcome of his testimony before the grand jury, i.e., the indictment, or cast substantial doubt on the United States Government's good faith in the extradition process. Or, in the words of the Supreme Court, were the "structural protections of the grand jury so compromised as to render the proceedings fundamentally unfair, allowing a presumption of prejudice." *Bank of Nova Scotia,* 487 U.S. at 257, 108 S.Ct. 2369.

The answer is difficult. One can imagine the effect that revelation of the $4,000 kickback would have had on both deliberative bodies, as well as the absence of reliable evidence as to the first two transactions and the contradictory evidence as to the last and some in between. Undeniably, the effects would have been dramatic.

Certainly the presumption of regularity supporting prosecutorial decisions (517 U.S. 456, 116 S.Ct. at 1486) cited by the Court in *Armstrong* is severely strained in this case, and it is tempting to elucidate both processes as much as possible by ordering disclosure of every aspect of Gervacio's credibility and the United States Government's knowledge of its witness and its case and its reasons for delaying revelation of Gervacio's misconduct to the trial court. The fact that Gervacio will not be a trial witness does not end the matter, since the court would be well within its power to sanction the Government under *Bank of Nova Scotia* for a serious enough breach of the grand jury process.

More problematic is the nature of Gervacio's grand jury testimony and his affidavit in support of extradition,[7] since he essentially just recited the reports and investigative findings of others. It would appear possible that virtually any administrative case agent could have read the materials available to Gervacio and filled his shoes in both proceedings. This fact, which might appear to diminish Gervacio's personal significance in the present inquiry might invoke the harmless error analysis of the Court in *Bank of Nova Scotia* as to the motion to dismiss.

In the absence of clear evidence that Gervacio, either as an agent of the Government or with the active complicity of the Government, intentionally fabricated the entire case versus Siriprechapong (as in *Basurto, infra*),[8] it is perhaps difficult to see how many of the requested items regarding Gervacio would shed any more light on the fundamental due process issues which the trial court faces in the motions to dismiss.

Similarly, without clear evidence that the Government has chosen to prosecute Siriprechapong for some unconstitutional reason (as was alleged in *Armstrong*), compelling disclosure of its confidential decision-making processes and communications, with some exceptions, would arguably appear to violate current standards established by the Supreme Court in *Armstrong*.

Before proceeding to the specific analysis of each of Defendant's discovery requests, it would be helpful to revisit in some greater detail the motions to dismiss.

A. *Discovery Requested by Defendant re: Motion to Dismiss for Grand Jury Misconduct*

In General, Defendant seeks to discover any information related to Frank Gervacio's credibility, as potentially exculpatory under *Armstrong, Brady v. Maryland* and the court's supervisory power.

As noted above, the Supreme Court in *Brady* ruled that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland, supra,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

Defendant in the case at bar seeks to invoke the Supreme Court's subsequent ruling in *Agurs* which applied a three-tiered analysis for determining materiality depending on whether the case involves 1) the prosecutor's knowing use of perjured testimony,

---

7. This court has also received and considered a copy of Gervacio's affidavit in the extradition proceeding, and finds it essentially consistent with his grand jury testimony.

8. The defense asserts that Gervacio's motive for doing so must be financial, "money." RT 67.

2) a defendant's specific request for exculpatory evidence, and 3) a general request or no request at all. The Court in *Agurs* established a strict standard for materiality when the prosecutor knowingly uses perjured testimony. *U.S. v. Agurs*, 427 U.S. 97, 103–04, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The Court did not extensively articulate the standard for materiality following a specific request for exculpatory evidence. Under the *Agurs* analysis, a general request for exculpatory evidence is treated as a general *Brady* request. In such instances, the prosecutor commits constitutional error only "if the omitted evidence creates a reasonable doubt [as to a defendant's guilt] that did not otherwise exist." *Id.* at 112, 96 S.Ct. 2392.

In 1985, a majority of the Supreme Court, without expressly so holding, appears to have modified *Agurs'* three-tiered analysis, replacing it with one standard of materiality, regardless of the level of specificity of the *Brady* request. *U.S. v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) This case set the standard for materiality of *Brady* evidence. The government may not withhold evidence from a defendant if it is material to his defense, i.e., if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. (Failure to disclose payment contracts to informants violates due process.) *Id.*, 473 U.S. at 668, 105 S.Ct. 3375. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* The Court in *Bagley* applied the same test of materiality to impeachment and exculpatory evidence under *Brady*. *Bagley*, 473 U.S. at 675, 105 S.Ct. 3375.

Defendant also invokes the federal trial court's inherent powers to supervise its proceedings so as to see justice done. This is in concert with the court's power to interpret the Constitution, and its supervisory authority over the administration of criminal justice. To these ends, the Supreme Court has formulated rules of evidence to be applied in federal criminal prosecutions. In formulating such rules, the Supreme Court has been guided by considerations of justice not limited to the strict canons of evidentiary relevance. *McNabb v. United States*, 318 U.S. 332, 341, 63 S.Ct. 608, 87 L.Ed. 819 (1943) (Convictions reversed where defendants' confessions were admitted into evidence despite their having been questioned before being taken before commissioner or judge and without assistance of counsel.)

On occasion, and in widely varying contexts, federal courts have dismissed indictments because of the way in which the prosecution sought and secured the charges from the grand jury. *See, e.g., United States v. Estepa*, 471 F.2d 1132 (2d Cir.1972) (indictment dismissed where grand jury misled into believing that hearsay evidence was eyewitness testimony) *but see U.S. v. Samango*, 607 F.2d 877 (9th Cir.1979) (prosecutor's use of incompetent or hearsay evidence not sufficient to justify dismissal of indictment); *U.S. v. DeMarco*, 401 F.Supp. 505, 513 (C.D.Cal. 1975), *Aff'd at* 550 F.2d 1224 (9th Cir.1977), *cert. denied* 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977) (dismissal of indictment proper where prosecutor had threatened informant with indictment to obtain testimony in another case and grand jury was unaware of prosecutor's improper motive for bringing indictment).

A dismissal may properly be based either on constitutional grounds or the court's inherent supervisory powers. See generally *U.S. v. Basurto*, 497 F.2d 781 (9th Cir.1974). Whatever the basis of the dismissal, the courts' goal has been the same, "to protect the integrity of the judicial process." *U.S. v. Leibowitz*, 420 F.2d 39, 42 (2d Cir.1969), particularly the functions of the grand jury, from unfair or improper prosecutorial conduct.

There is a limit, however. The Ninth Circuit has upheld a trial court's refusal to invalidate a federal indictment because the government did not produce before the grand jury all evidence in its possession tending to undermine credibility of witnesses appearing before the grand jury. *Loraine v. United States*, 396 F.2d 335, 339 (9th Cir. 1968), *Reh'ng den.* 1968, *cert. denied,* 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968) (grand jury indictment valid even where defense accused government of suppressing evidence which would have had a material bear-

ing on credibility of three witnesses who testified before grand jury. One had a criminal record and was then under criminal indictment in three or four additional cases. Another had been charged with embezzling $85,000 from a company. The third had been permanently enjoined by the State of New York from selling or dealing in securities.) [9]

The court in *Loraine* distinguished the duty of a prosecutor at trial and the duty when presenting a case before a grand jury as "not necessarily the same." *Id.* The court found that

> an indictment, if returned by a legally constituted and unbiased grand jury and valid on its face may not be dismissed because it is based upon hearsay testimony (*Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956)), incompetent evidence (*Holt v. United States*, 218 U.S. 245, 248, 31 S.Ct. 2, 54 L.Ed. 1021), or illegally seized evidence (*United States v. Blue*, 384 U.S. 251, 255, n. 3, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966)). *Id.*

The court further held that defendant was accorded the full protections of the Fifth and Fourteenth Amendments when, at the trial on the merits, he was permitted to expose all the facts bearing on his guilt or innocence.

Defendant in the case at bar relies on the Ninth Circuit ruling in *Basurto*. The court in that case held that

> "[t]he Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached."

*U.S. v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974).

In *Basurto*, a co-conspirator turned informant testified falsely as to defendant's participation in a scheme to import marijuana prior to 1971. This testimony was material, since the law applicable to this offense

changed significantly in 1970. Specifically, those convicted of offenses occurring prior to 1971 were subject to a mandatory minimum sentence of five years, while those convicted under the new statute were not subject to such inflexible sentencing. There was no other witness who testified before the grand jury. Upon learning of the witness's perjured testimony, the prosecutor immediately informed defense counsel, but not the grand jury or the court. The prosecutor did refer to the fact that some of the witness's testimony was false in his opening statement at trial. No other witness testified at trial.

In the case at bar, Gervacio told the grand jury that Siriprechapong in concert with five co-conspirators began their smuggling operation in 1973. Prosecutors now concede that they cannot prove that the operation began that long ago. They are also hedging as to the 1978 transaction. Gervacio also made statements which have been flatly contradicted by two other prosecution witnesses: one convicted smuggler who says he never told Gervacio that Siriprechapong was his supplier, and another who says that Siriprechapong never used container ships to import marijuana. Gervacio has been charged with the felony of accepting an illegal gratuity. He is not expected to testify against Siriprechapong at trial.

The *Basurto* case is distinguishable from the case at bar in several respects: First, Frank Gervacio, the witness whose testimony before the grand jury is under attack, will not be a witness at trial. Second, he was not testifying as to his own personal knowledge, but was summarizing the reports of others. The others will presumably be subpoenaed to testify at trial and can be cross-examined regarding their statements as summarized by Gervacio. Gervacio's allegedly perjured testimony could be relevant to his own credibility, but it is hardly material to the Defendant's defense.

The Government also relies on the court's decision in the *Laykin* case to say that a mere variance in starting date of a criminal conspiracy is not a sufficient misrepresenta-

---

9. As distinguished from the case at bar, there was no suggestion that these witnesses testified  falsely before the grand jury.

tion to have misled a grand jury. *U.S. v. Laykin*, 886 F.2d 1534 (9th Cir.1989), *cert. denied*, 496 U.S. 905, 110 S.Ct. 2586, 110 L.Ed.2d 267 (1990). Siriprechapong argues that the Government concealed evidence that he was not involved in the importation of marijuana, at any time, and that this is a material misrepresentation going beyond a mere variance in dates.

As in *Basurto*, the government presented a single witness to the grand jury—Gervacio. Based mostly on information he received from others, Gervacio implicated Siriprechapong in a series of marijuana importations from 1973 to 1987.

Defendant also relies on *Armstrong*, claiming that he has established a prima facie claim of governmental misconduct, a violation of the Fifth Amendment to the Constitution. He claims that he has made a clear showing that the indictment was obtained by misconduct, based on the misstatements cited above and Gervacio's inherent lack of credibility.

## B. Discovery Requested by Defendant re: Lack of Jurisdiction (Extradition Proceedings)

Siriprechapong cites the "doctrine of specialty" in attacking the extradition process. That doctrine "prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering state agreed to extradite." *U.S. v. Andonian*, 29 F.3d 1432, 1434–35 (9th Cir.1994), *cert. denied*, 513 U.S. 1128, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995) (quoting *U.S. v. Van Cauwenberghe*, 827 F.2d 424, 428 (9th Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 859 (1988). The doctrine limits the jurisdiction of the extraditing country.

The extradition treaty between the United States and Thailand contains an exception to the doctrine of specialty, which is that an extradited person may be tried for an offense other than the one for which he was extradited if the extraditing country ("requested state") consents. Treaty Between the United States and the Kingdom of Thailand Relating to Extradition, *Signed at Washington December 14, 1983, Entered into Force May 17, 1991*, art. 14, T.I.A. No. 9001.000, 1991 WL 787304 at 787305 ["Treaty"][10]. A court presumes consent if the extraditing country would not consider the charges to be independent of one another. *U.S. v. Sensi*, 879 F.2d 888, 895–96 (D.C.Cir.1989); *cited in Andonian*, 29 F.3d, at 1434–35.

In the *Sensi* case, the order of extradition charged conspiracy to aid and abet the possession and distribution of cocaine, as well as money laundering. The defendant was convicted of money laundering offenses, but neither he nor any of his co-defendants were convicted of the narcotics charge. The defendants challenged their conviction on the basis that their extradition had been obtained by an indictment which was narrower in scope than the superseding indictment in which they were charged, after they were brought to the United States.

The court in *Sensi* looked to the language of the applicable treaty to determine the protection an extradited person is afforded under the doctrine of specialty. The court found the appropriate test to be "whether the extraditing country would consider the acts for which the defendant was prosecuted as independent from those for which he was extradited." *Andonian, citing Andonian*, 29 F.3d at 1435.

The court found that the extraditing country ("requested state"), Uruguay, would not have considered the offenses charged in the superseding indictment to be independent from the charges in the indictment included in the application for extradition. The court found that the superseding indictment altered neither the nature of the scheme alleged nor the particular offenses alleged, that the only significant difference between the superseding and original indictments was that the superseding indictment was more specific in its description of the scheme, even though it alleged a greater number of currency shipments. *Id.* at 1437.

The court in *Sensi* also refused to invalidate the extradition despite the trial court's exclusion from evidence of a witness statement which had been used to obtain the

**10.** The Extradition Treaty of 1929 was also in- voked in the case at bar.

defendants' extradition, noting that "the doctrine of specialty has never been construed to permit foreign intrusion into the evidentiary or procedural rules of the requisitioning state, as distinguished from limiting the jurisdiction of domestic courts to try or punish the fugitive for any crimes committed before the extradition, except the crimes for which he was extradited." *Andonian* at 1438, *quoting U.S. v. Thirion*, 813 F.2d 146, 153 (8th Cir.1987). This despite a conflict between a government witness's sworn declaration (excluded by the court from evidence) in which he said one defendant was laundering money for drug traffickers, and his testimony at trial, where he said the same defendant stated "that he didn't want to have anything to do with drugs." The Court found that the government's inability to admit the declaration into evidence did not prove that it was false. *Id.*

In the case at bar, Siriprechapong argues that he has proved that the Government obtained his extradition via false evidence. He may be able to exclude from evidence some of Gervacio's statements used to obtain his extradition. The question then becomes, whether there is sufficient evidence remaining to assume the decision to extradite would have been the same.

### GENERAL RECOMMENDATION OF THIS COURT

■ This court finds and therefore recommends that the improprieties alleged against and admitted by Agent Gervacio, specifically the $4,000 "gratuity," and his irregular relationship with Woods and the U.S. Attorney's delayed revelation of these facts to the trial court, as well as defects in the proof of the 1973 and 1978 loads, Ells' denial that he identified Siriprechapong as his source to Gervacio, and Gervacio's misleading answer to a grand juror about the opportunity of Groefsema and Matthews to tailor their statements—taken together, constitute a sufficient "clear" threshold showing of some evidence tending to show governmental misconduct, to order additional discovery regarding Gervacio's credibility and other matters related to the presentation of the case to the grand jury and the Thai government.

The court should be concerned with the integrity of both proceedings and the role of the U.S. Government in this unusual and important case, at least to the extent of affording a broad inquiry into Defendant's substantive constitutional claims. Consideration of the maximum information available on these issues will assist the trial court to determine, in the words of the Supreme Court, whether there is "grave doubt that the decision to indict was free from the substantial influence of such violations." *Citation omitted.* *Bank of Nova Scotia, supra,* 487 U.S. at 256, 108 S.Ct. 2369.

The basis for this court's recommendation is threefold. The *Brady* line of cases clearly establishes a principle of fundamental fairness that must attend the discovery process and trial of the case. While *Brady* does not strictly compel discovery in this context, the underlying principle compelling disclosure of exculpatory evidence in a criminal case is worth noting.

Second, the Defendant's motions to dismiss are grounded in the due process clause of the Constitution. As stated above, this assertion of rights is analogous to the motion to dismiss for selective prosecution involved in *Armstrong.* In that context, the courts have had no problem with granting discovery ancillary to the dispositive motion, based upon the proper showing. Mr. Siriprechanpong should be entitled to no less under the circumstances alleged in this case, which also involves Fifth Amendment claims.

This brings us to the third basis for recommending discovery in the instant case. The Court in *Armstrong* does not specifically discuss the basis for the grant of discovery in that case. It merely "assumed that discovery would be available if the defendant could make the appropriate threshold showing." 517 U.S. 456, 116 S.Ct. at 1485–86.

To the extent that an explicit basis is required, this court finds it in the supervisory powers of the court and commends the reasoning of the District Court in *U.S. v. Lopez*, 765 F.Supp. 1433 (N.D.Cal.1991) (*"Lopez I"*) and the Ninth Circuit's amended opinion at *U.S. v. Lopez*, 4 F.3d 1455 (9th Cir.1993) (*"Lopez II"*). In that case, now

Chief Judge Patel of this court considered the defendant's claim that his right to counsel had been interfered with by the government, which interviewed him without his retained counsel present. The District Court found a violation of a State Bar rule prohibiting such contact. The court found the appropriate remedy to be dismissal of the indictment.

In discussing its supervisory powers, the court defined the term as the "inherent ability of federal courts to 'formulate procedural rules not specifically required by the Constitution or the Congress.'" *Lopez I (Citation omitted.)* 765 F.Supp. at 1457.

> In contrast to constitutional grounds for dismissal, the supervisory power theory "is premised on the inherent ability of the federal courts to 'formulate procedural rules not specifically required by the Constitution or the Congress.'" (Citations omitted.) A court's supervisory power permits the court to supervise the administration of criminal justice.
>
> *Id.*

The supervisory power has frequently been used by federal courts as a means of sanctioning and deterring prosecutorial misconduct. *Id.* at 1458. "The supervisory power may be used not only to vindicate a defendant's rights, but also to preserve judicial integrity and/or to deter illegal or improper conduct." (Citation omitted.) *Id.*

On appeal, the Ninth Circuit held that the District Court was correct in holding that the prosecutor had an ethical duty to avoid communicating directly with a represented defendant. *Lopez, as amended,* 4 F.3d at 1463 (9th Cir.1993). The Court of Appeals did not question the District Court's analysis of its supervisory powers, but it vacated the lower court's dismissal of the indictment, remanding for consideration of other sanctions.

The Court of Appeals cited "three legitimate grounds for a court's exercise of supervisory power: 'to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial in-

tegrity by insuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct.'" (Citation omitted.) *Id.* at 1463. The Court of Appeals also noted that exercise of supervisory powers is an appropriate means of policing ethical misconduct by prosecutors. Id. Referring to willful deceptions of the trial court, the Court of Appeals stated, "[W] have no doubt but that federal courts are empowered to deal with such threats to the integrity of the judicial process." *Id.*

Thus, both courts in *Lopez* specifically found appropriate the exercise of supervisory powers in the context of a claim of prosecutorial misconduct, such as that in the case at bar. In addition, the courts made clear that the inherent power included the formulation or rules which would facilitate the main inquiry. Unquestionably, such powers include the authority to order appropriate discovery which would illuminate the fundamental issue.[11]

While the Supreme Court in *Armstrong* merely "assumed that discovery would be available" upon the appropriate threshold showing (504 U.S. 181, 112 S.Ct. at 1844), it is perhaps preferable to make explicit the basis for discovery in the instant case because of the close relationship between the supervisory power and issues of prosecutorial misconduct.

### FINAL ANALYSIS: DEFENDANT'S SPECIFIC DISCOVERY REQUESTS

**A. Evidence related to the case of *United States v. Frank M. Gervacio***

Defendant states that the Government has now conceded that Gervacio made misstatements to the grand jury which indicted Defendant and in his affidavit in support of Defendant's extradition from Thailand, but argues that the misstatements were innocent and immaterial. Defendant claims that this places Gervacio's credibility at issue. Defendant says the Government knew or should have known Gervacio was untrustworthy or

---

**11.** In fact, Judge Patel in Lopez issued an order in the nature of discovery directing the U.S. Attorney to address a number of questions. This order was previously appended to a defense pleading in these motions to dismiss.

mentally unstable, and engaged in misconduct by placing him before the grand jury and relying on his affidavit in the extradition process. Therefore any and all evidence which tends to impeach Gervacio is material to proceedings on the motions to dismiss.

Defendant relies on *United States v. George*, 786 F.Supp. 11, 14 (D.D.C.1991). This case was part of the Iran–Contra prosecutions developed by the Office of Independent Counsel (OIC). Defendant Clair E. George was former deputy director for operations of the Central Intelligence Agency. The trial court held that he was entitled to all documents produced by the federal government in discovery in prosecution of others allegedly involved in the same scheme. The court cited the OIC's own focus on the similarities between the issues in the George case and in the cases against defendants Oliver North and John Poindexter in its argument that a special judge should be assigned. The court found that, "Although Mr. George is not charged with all of the same crimes as North and Fernandez [another defendant], there is no doubt that the transactions which led to the charges are part of the entire series of events known as the Iran–Contra affair... charges against Mr. George refer to lies that he allegedly told concerning these events, including the actions of Fernandez and North." *Id.* at 14–15.

In the case at bar Gervacio is not accused of being a co-conspirator with Defendant. However, evidence which the Government would consider relevant to his case, would be relevant to his credibility in the case against Defendant. For the same reason, evidence related to Michael Woods would also be relevant to Gervacio's reliability as a witness and, perhaps more important, to the Government's knowledge. This would include his testimony before the grand jury which indicted Gervacio, their meetings and discussions about the cash gift, the relationship between the Government's payment to Woods and Woods' gift to Gervacio, surveillance of Woods or his property and any information regarding the decision whether or not to prosecute Woods. Similarly, all evidence regarding Gervacio's awareness of his own wrongdoing and records of similar problems, would be relevant both to his credibility and to the Government's knowledge.

The Government attempts to distance itself from the specific office of the Department of Justice which is prosecuting Gervacio, claiming that it would be burdensome to produce the discovery already furnished to Gervacio's counsel. However, the court in *George* dealt with such an objection by referring to the fact that all of the documents sought by defendant had already been collected and that the "only effort required would be the work of a few strong people to move some very large boxes a few feet." 786 F.Supp. at 14. In addition, the court in *McVeigh* dismissed the government's objection to some of the defense requests as "burdensome" as follows: "that is not a proper objection. The failure to comply with a Constitutional command to present evidence fairly at trial is not excused by any inconvenience, expense, annoyance or delay." 954 F.Supp. at 1450.

For the above reasons, Defendant's requests A—1, 3, 4, 5, 7, 8a, 8b, 8g, 8h, 8i, 9a, 10a, 10A, 11, 12, 13a, and 13b should be granted. Items 2, 6, 8c, 8d, 8e, 8f, 10b-f should be denied without prejudice.

The Government has volunteered to produce some documents in this category (listed in Government supplemental brief at page 16).

**B. Evidence concerning the Indictment of Mr. Siriprechapong**

Defendant claims that between September 23, 1991 and November 15, 1991, the evidence against him somehow "ballooned" to include alleged facts which resulted in his indictment. The dangling inference is that Defendant believes that Gervacio did something improper to accomplish this, and therefore Defendant seeks any such information from the prosecutor's files.

The Government contends that most of these requests violate Fed. R.Crim. P 16(a)(2).

It also says it has already produced some relevant material (listed in pages 17–48 of its Opposition to Defendant's Motion to Dismiss for Grand Jury Misconduct). Excerpts were gathered into the Government's Binder, sec-

tions A–H and have been reviewed by this court. Additional reports were included in a group of exhibits attached to the above-cited Opposition and labeled 1–21. Gervacio's September 23, 1991 investigative report is Exhibit 14.

Defendant claims his indictment was invalid because it was secured by prosecutorial misconduct. This is most closely analogous to a claim of selective prosecution, for which the standard for discovery has been established by the Supreme Court in the *Armstrong* case, which may supersede the *Barket* case. In *Barket,* the court found "sufficient factual basis" for disclosure of discovery materials requested by defendant in connection with a charge of prosecutorial misconduct. *U.S. v. Barket,* 64 F.R.D. 573, 575 (W.D.Mo. 1974), *citing Brady.* Unfortunately, the court failed to set forth the factual basis except in referring to numerous newspaper articles attached to the defendant's motion. *Id.* at 574.

Neither selective prosecution nor governmental misconduct is a defense to a criminal charge, but a separate claim for violation of a defendant's constitutional rights, equal protection rights under the due process clause of Fifth Amendment and due process itself, respectively. The Court in *Armstrong,* after discussing the requirements to prove a selective prosecution claim, described the showing necessary to obtain discovery in support of such a claim in various forms, as follows, characterizing it as: a "rigorous standard," specifically, "some evidence tending to show the existence of the essential elements of the defense." *U.S. v. Armstrong, supra,* 517 U.S. 456, 116 S.Ct. 1480, 1488, 134 L.Ed.2d 687 (1996).

The court in *Armstrong* rejected any right of discovery pursuant to Fed.R.Crim.P. 16(a)(1)(C) to support a claim of selective prosecution:

> We hold that Rule 16(a)(1)(C) authorizes defendants to examine Government documents material to the preparation of their defense against the Government's case-in-chief, but not to the preparation of selective-prosecution claims.

517 U.S. 456, 116 S.Ct. 1480 at 1485.

The Defendant in the case at bar claims that the information he is requesting is not related to a "sword" claim such as selective prosecution, but to a "shield" claim in the parlance of *Armstrong,* one which "refute[s] the Government's arguments that the defendant committed the crime charged." *Id.,* 517 U.S. 456, 116 S.Ct. at 1485. Defendant also claims he is entitled to discovery of evidence tending to show involvement of persons other than or in addition to the defendant, as material to his defense, citing *McVeigh, supra,* 954 F.Supp. 1441 at 1447 (Defendant's Rule 16 discovery not limited by holding in *Armstrong* where he is seeking evidence of involvement of others).

The court in *McVeigh* justified its decision granting such discovery in part based on the fact that the defendant was facing a potential penalty of death and under 18 U.S.C. § 3592(a) "minor participation" is a mitigating factor and non-prosecution of equally culpable participants may be an additional mitigator. "Accordingly, anything tending to show involvement of persons other than or in addition to Timothy McVeigh may be material to his defense." *Id.* at 1447.

There are serious problems with applying this analysis to the case at bar. Defendant's colleagues in the alleged criminal enterprise in this case are known, and most of them have been prosecuted and some of them have already been tried, convicted and have completed their sentences. This is clearly different from the situation in *McVeigh,* where unknown perpetrators were described in the indictment and the defense was hoping to discover the identity of a shadowy "John Doe" possibly sitting in a Ryder truck outside the Murrah Federal Building the day of the bombing.

Defendant in the case at bar has already shown significant contradictions in the Government's evidence presented to the grand jury and has substantially challenged the Government's credibility as reflected in the rulings as to section A above. But it has not satisfied either the *Armstrong* test or the showing in *Barket* with respect to intentional prosecutorial misconduct.

For the above reasons, all of the requests in Section B of Defendant's discovery requests should be denied.

**C. Evidence Concerning the Extradition of Mr. Siriprechapong**

**D. Evidence of Efforts Made by the U.S.A. to Avoid Requesting Mr. Siriprechapong's Extradition from Thailand**

Defendant argues that both of these categories of information are relevant to whether the U.S. dealt honestly with the government of Thailand and consequently, whether the Government observed the terms of the treaty between the two countries in order to obtain Defendant's extradition. Sirirpechapong claims that the Government's attempts to locate him without extraditing him relate to its belief that extradition would have been "futile." Defendant claims that under *Armstrong* he has made a "credible showing" that the extradition process was "tainted by the U.S. Government," and therefore is entitled to discovery.

The parties appear to agree that the decision of the Thai government to extradite Mr. Siripriechapong was a "tortuous" one. However, at the hearing before this court on April 10, counsel for the Defendant admitted that the matter was more complicated by the politics of the situation than by the evidence. RT 27. In any event, it would be impossible for the court to speculate about what contributed to the extradition of the Defendant beyond what appears in the record of those proceedings. However, the court may well wish to inquire further into the possibility of any fraudulent misrepresentations by the United States Government in obtaining extradition. Nothing improper appears in the Government's alleged investigation of alternative means to secure the Defendant's presence for prosecution.

Accordingly, the Defendant should not be entitled to internal governmental documents reflecting the Government's preparation of its case for extradition. Some of the documents requested may be public records which the Government has probably already assembled. In fact, the Government in its final memorandum, at pages 23–25, provides an extensive list of documents already produced, discussing the facts of the extradition process and the investigative reports which supported the evidence summarized in the extradition request. The Government states

it has also provided defendant with a complete set of the extradition documents submitted to the government of Thailand (Bates # 1372–1455).

For the above reasons, if they have not already been produced, documents responsive to defendant's Requests C—5 and 7 should be produced *in camera*. Documents responsive to Request 6 would be highly likely to be subject to work product protection and should not be produced. Requests 1, 2a-c, 8, 9, and 10 should be denied.

Defendant does not address Government attempts to ascertain Defendant's whereabouts without extraditing him from Thailand. The Government says this issue has been dealt with in connection with defendant's motion to dismiss on speedy trial grounds.

Accordingly, Request D should be denied.

**E. Policies and Procedures of U.S. Customs Service**

Defendant seeks information regarding U.S. Customs procedures, internal departmental information about Gervacio, including his Internal Affairs file, *Henthorn* information, and tax returns of Gervacio and Woods. Defendant wishes to show both Gervacio's lack of credibility and the Government's misconduct in concealing his problems and misdeeds. Defendant offers an Opinion of the Office of Legal Counsel that the Customs Service is not authorized to offer financial rewards for information regarding the whereabouts of indicted drug traffickers. Presumably, this is related to attempts to locate Defendant and apprehend him without going through the formalities of an extradition. Defendant says this Opinion calls into question the payments made to informant Michael Woods and, indirectly, by Woods to Gervacio.

Defendant believes that the evidence he is seeking will show that the Government committed a fraud on the court by arguing Gervacio's credibility in opposing defendant's motions to dismiss. Specifically, the Government delayed its *Henthorn* response for two months, and concealed from the court the gratuity Gervacio received from Woods, even

though at that time Gervacio was identified as a potential witness at trial, in late 1996 or early 1997.

Obviously, these requests are based on matters not involving the grand jury or extradition, except to the extent that the Defendant claims implicitly that his newly discovered evidence should be submitted for reconsideration. The main problem with these requests is that Gervacio will not testify for the Government at trial. The information requested by Defendant is generally discoverable only to challenge the credibility of witnesses, under the holdings in *Henthorn* and *Cadet*. However, as seen above, the court may wish to examine Gervacio's credibility in light of some of this information to determine the extent of any governmental misconduct

With regard to measures taken by the parties pursuant to the August 23, 1996 order by Judge Walker granting Defendant's motion for a *Henthorn* review, the Government says it sent its *Henthorn* inquiry to all relevant agencies on October 15, 1996. Of the 27 witnesses named on the Government's Second Witness List, filed July 14, 1997, only two are agents, Mark Bastan, the original case agent on the Ells case, and retired DEA Special Agent Joel Wong, who was one of the agents present when Ells' 8-1/2 tons of marijuana were seized at the Seattle/Tacoma port. The Government claims the agents' testimony will only be secondary to the testimony of the "numerous marijuana importers who did business with [Siriprechapong]."

The Government says that it has found no discoverable information pursuant to *Henthorn* and *Giglio*. There is some information about Agent Bastan which has not been submitted to a magistrate judge for *in camera* review because the Government is still considering not calling Bastan as a witness. Because the earliest trial date is mid- to late summer, the Government has postponed this decision.

With regard to the court's holding in *Shaffer*, (*U.S. v. Shaffer*, 789 F.2d 682, 689 (9th Cir.1986)), and its pertinence to the Defendant's request for Gervacio's and Woods' tax returns, the Government observes that the court in *Shaffer* ordered discovery into bene-

fits received by informants who would be witnesses at trial. *Id.* at 688–89. Neither Gervacio nor Woods will be witnesses at trial. Also, the court in *George* denied evidence regarding North's finances, even though he was charged with receiving an illegal gratuity. This evidence was found to be tangential to George's prosecution. 786 F.Supp. at 15.

This court finds that Customs Service rules and regulations regarding informants, may be marginally relevant to the court's inquiry into Gervacio's conduct. This information would tend to show whether he knew he was breaking established rules and whether his supervisors and the Government were on notice that he was straying outside the bounds of permissible behavior. If they exist, these should be produced.

Gervacio's Internal Affairs file should be submitted to the trial court for *in camera* review to determine the extent of the Government's knowledge of Gervacio's problems related to credibility. Any documents related to his drunk driving arrest, if not already produced, would be relevant to the Government's knowledge of his credibility and should also be produced for *in camera* review. Any discipline for misconduct should also be disclosed *in camera*, as it may show Government knowledge of his difficulties.

For the above reasons, Request E—1 should be granted, E—2, 3 and 4 should be granted, for *in camera* review. The rest are already covered or should be denied.

**F.  U.S. Attorney's knowledge of Gervacio's conduct.**

The Government says this information has been provided in June 11, 1997 submissions to the court and at the June 12, 1997 *in camera* hearing before Judge Walker.

These requests should be denied, since they are no longer necessary.

**G.  AUSA John Lyons Disciplinary File**

This request is not discussed specifically in Defendant's supplemental briefing and this court assumes it has been abandoned. At any rate, it should be denied, unless the trial court feels it is justified on the basis of other information known to the court.

**H. The Date the Government Learned it Had no Evidence to Support the Charge that Siriprechapong Participated in Marijuana Importation as Early as 1973.**

Defendant's supplemental brief states that this request has been satisfied.

**I. Other Cases Gervacio Worked on Between 1987—Present**

Defendant claims this information would be relevant to Gervacio's credibility, the alleged "innocence" of his false testimony in this case, and the Government's conduct in relying on him as the exclusive witness before the grand jury and the primary source of the "evidence" contained in its extradition request to Thailand. The request is limited to information reflecting dishonesty, lack of truthfulness, selective memory, or other questionable conduct.

Limited in this way, the information would appear to be available in materials which have already been disclosed or should be ordered disclosed herein. Any discrepancies would appear to be outweighed by the Government's concern that other investigations might be compromised. While this problem could conceivably be corrected by redacting or summarizing pertinent material, the effort would appear to be duplicative and unnecessary.

Accordingly, this Request should be denied.

**J. Recorded Interviews with Informants**

Defendant requests any such material not already produced, as well as recorded evidence pertaining to U.S. v. Gervacio, as *Brady* and *Giglio* material.

The Government has produced the transcript of a recorded interview between Michael Woods and Reno Customs agents, and also audio and video tapes of undercover meetings between Michael Woods and James Ells, and between Michael Woods, and Lars Groefsema, and also audio tapes of interviews of Henry Matthews by Michael Donofrio.

Any additional responsive materials should be submitted for *in camera* review.

**K. Notes or Reports of IRS Agent Tacderan**

Defendant seeks these notes because Tacderan was present when Gervacio was interviewing James Ells, who, according to Gervacio, identified Siriprechapong as the source for a 1987 shipment of marijuana. Mr. Gilbert Eisenberg, counsel for Ells, attests to the improbability of Ells' making this statement, and Gervacio's report of the interview does not include any reference to this alleged identification of Siriprechapong by Ells. Defendant also asks for any notes by Tacderan which might impeach Gervacio.

The Government rejects this request as prohibited by Fed.R.Crim.P. 16(a)(2), since neither Gervacio nor Tacderan will testify at trial. Further, Agent Tacderan has stated that no such notes exist.

With regard to this court's direction in its briefing order that the parties apply the holding in *U.S. v. Bryan*, 868 F.2d 1032 (9th Cir.1989), *cert. den.*, 493 U.S. 858, 110 S.Ct. 167, 107 L.Ed.2d 124 (1989) to this request, the Government says it is moot because the notes don't exist, but even if they did, the IRS did not participate in the investigation of Siriprechapong—it was investigating James Ells—and there has been no showing that the notes could be material or exculpatory under the *Brady* line of cases. *Bryan*, 868 F.2d at 1037.

If the notes do not exist, this request is moot.

CONCLUSION

For the reasons stated hereinabove, Defendant's motion for discovery related to his motions to dismiss should be granted in part and denied in part.

CLARIFICATION OF REPORT AND RECOMMENDATION

INTRODUCTION

This court submitted its Report and Recommendation ("R and R") regarding Defendant's Motion to Compel Discovery on April 24, 1998. The District Court (Hon. Vaughn R. Walker) conducted a hearing on June 9, 1998, and solicited comments from the par-

ties. Judge Walker issued an Order after the hearing adopting the R and R, with some modifications, and re-referring certain items for clarification. These last are E–5 through E–11 of Defendant's discovery requests.

## CLARIFICATION

The R and R included an analysis of the general principles governing discovery in a federal criminal case as well as analysis of specific discovery requests. This court stated that Requests E–5 through E–11 were "already covered or should be denied." The types of information specified in these requests had been discussed in the analysis of general principles. In what follows the court will here connect more directly the aspects of the analysis with the requests to which they apply.

Requests E–5 through E–9 [1] are:

E–5　Training given or available to Gervacio concerning ethical conduct;

E–6　Any Customs' rules or regulations Gervacio may have violated during his employment with that agency;

E–7　The names of any and all Customs agents or officials who knew of Gervacio's misconduct before June 11, 1997, and any documents reflecting or relating to their response to Gervacio's misconduct;

E–8　Any other information the agency would be required to disclose pursuant to this court's *Henthorn* [2] order, filed in August, 1996.

E–9　Records of any disciplinary action taken regarding Agents Donofrio, Yamashita, and Klink in connection with the Gervacio disclosure.

This court assumes that documents responsive to Requests E–5 through E–8 would be in Gervacio's personnel file or his Internal Affairs file. The personnel file was already produced, pursuant to the trial court's *Henthorn* order, when Gervacio was a potential trial witness. In the R and R this court recommended that Gervacio's Internal Af-

fairs file be produced to the trial court for *in camera* review. Consequently, documents responsive to Requests E–5 through E–8 should be produced.

This court would not recommend that documents responsive to Request E–9 be produced, considering them of little if any relevance to the motions to dismiss.

Requests E–10 and E–11 are:

E–10　Gervacio's 1992 tax returns and any tax returns reflecting the $4,000 gratuity he received from Michael Woods;

E–11　Michael Woods' tax returns for the years he received money from the U.S. government as a result of his work as a confidential informant.

The Supreme Court, in *Giglio v. U.S.*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), permitted discovery of agreements regarding informants (when credibility of a witness is an important issue in a case, evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and should be disclosed to defense and jury.)

This same reasoning also applies to payment arrangements. *U.S. v. Shaffer*, 789 F.2d 682 (9th Cir.1986) (Government may be required to disclose financial information regarding paid informant as material to informant's credibility.) Discovery could include: 1) status as paid informant in another criminal investigation; 2) full benefits and promises received in exchange for cooperation; 3) full extent of informant's assets; 4) status of informant's tax liability. Materiality depends on trial judge's assessment of likely effect on outcome of trial. *Id.* at 689.

Most if not all of the cases in which courts have ordered discovery regarding a financial arrangement between the prosecution and an informant have involved informants who testified as witnesses at trial. In the case at bar, neither Gervacio nor Woods is named as a trial witness. Gervacio was, however, the sole witness before the grand jury which

---

1.　Requests E–9 and E–10 and E–11 are discussed separately.

2.　*U.S. v. Henthorn*, 931 F.2d 29 (9th Cir.1991), *cert. denied* 503 U.S. 972, 112 S.Ct. 1588, 118 L.Ed.2d 306 (1992) (government has duty to ex-

amine personnel files of testifying officers upon a defendant's request for their production, to determine if they contain information that is or may be material to the defendant's case.)

indicted Defendant and summarized information provided by others, including Woods. His affidavit was the foundation of the Government's request to the Kingdom of Thailand to extradite Defendant to the United States. The rationale for Defendant's motions to dismiss the indictment for Governmental misconduct both before the grand jury and in the course of the extradition is that not only did the Government know Gervacio had accepted money from Woods, it also withheld that information from the grand jury, the Thai government and ultimately the trial court.

By seeking information regarding the tax returns of Gervacio and Woods, Defendant wishes to show both Gervacio's lack of credibility and the Government's misconduct in concealing his problems and misdeeds. Defendant believes that the evidence will show that the Government committed a fraud on the court by arguing Gervacio's credibility in opposing Defendant's motions to dismiss. Specifically, Defendant argues that the Government delayed its *Henthorn* response for two months and concealed from the court the gratuity Gervacio received from Woods, even though at that time, in late 1996 or early 1997, Gervacio was identified as a potential witness at trial. Defendant urges the court to extend discovery to Gervacio's finances in the interest of preserving the integrity of due process in this case.

The trial court has a certain inherent authority to order and supervise discovery in a criminal case above and beyond any of the mentioned rules. In *U.S. v. Williams*, 792 F.Supp. 1120 (S.D.Ind.1992) (cited by both parties), a district court has held that any trial court has the ("inherent power, exercisable under appropriate circumstances, to assure the proper and orderly administration of criminal justice.") (Citation omitted.) *Id.* at 1123. The Supreme Court has held that "the court's supervisory power … may be used as a means of establishing standards of prosecutorial conduct before the courts themselves." *U.S. v. Williams*,[3] 504 U.S. 36, 47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). However, the Supreme Court imposed limits on a trial or appellate court's power to establish rules for grand jury proceedings. Specifically, it held that a court could not impose a rule which created a duty for the grand jury to consider exculpatory evidence, since that would exceed the limitations of the power of federal courts to reshape grand jury procedure. *Id.* at 47–52, 112 S.Ct. 1735. The Court distinguished the roles of grand and petit juries, and reiterated that the grand jury sits "not to determine guilt or innocence, but to assess whether there is an adequate basis for bringing a criminal charge." *Id.* at 51, 112 S.Ct. 1735. In the case at bar, Defendant urges the court to consider whether the grand jury was misled by the Government.

A motion to dismiss an indictment for grand jury misconduct must rest on an overriding constitutional theory that the "structural protections of the grand jury have been so compromised as to render the proceeding fundamentally unfair, allowing the presumption of prejudice to the defendant." *Bank of Nova Scotia v. U.S.*, 487 U.S. 250, 259, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), or an "abrogation of constitutional rights sufficient to support dismissal of an indictment." *U.S. v. Isgro*, 974 F.2d 1091, 1096 (9th Cir.1992), *cert. denied*, 507 U.S. 985, 113 S.Ct. 1581, 123 L.Ed.2d 148 (1993).

Thus, the court must address the question of whether potential additional challenges to Gervacio's credibility would sufficiently undermine confidence in the outcome of his testimony before the grand jury, i.e., the indictment, or cast substantial doubt on the United States Government's good faith in the extradition process. The answer may require the court's investigating the relationship between the Government and Gervacio.

The Attorney General and United States Attorneys retain "broad discretion" to enforce the Nation's criminal laws. They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." As a result, "[t]he presumption of regularity supports" their prosecutorial decisions and "in the absence of clear evi-

---

**3.** Not related to other *Williams* case, above.

dence to the contrary, courts presume that they have properly discharged their official duties." *U.S. v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996) (Citations omitted).

The presumption of regularity supporting prosecutorial decisions cited by the Court in *Armstrong* is severely strained in this case, and it is tempting to elucidate both the grand jury indictment and the extradition process as much as possible by ordering disclosure of every aspect of Gervacio's credibility and the United States Government's knowledge of its witness and its case and its reasons for delaying revelation of Gervacio's misconduct to the trial court. The fact that Gervacio will not be a trial witness does not end the matter, since the court would be well within its power to sanction the Government under *Bank of Nova Scotia* for a sufficiently serious breach of the grand jury process. As seen above, the court may wish to examine Gervacio's credibility in light of some of this information to determine the extent of any Governmental misconduct. This court therefore recommends that documents responsive to Requests E–10 and E–11 be produced to the trial court for in camera review.

## CONCLUSION

For the above reasons, this court recommends that, if they have not already been produced, that documents responsive to requests E–5 through E–8 be produced, either to the court for in camera review (Internal Affairs file or related documents) or to Defendant. Documents responsive to Request E–9 should not be produced. Documents responsive to Requests E–10 and E–11 should be produced to the trial court for in camera review.